**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Roanoke Division**

LAMEEK S. JOHNS,

       Plaintiff,

v.                                    CASE NO.  7:18cv00150

E. GWINN,

      Defendant.

**<u>MEMORANDUM IN SUPPORT OF DEFENDANT GWINN'S</u>**
**<u>MOTION TO VACATE, ALTER, OR AMEND THE JUDGMENT</u>**

Margaret Hoehl O'Shea
Assistant Attorney General
Criminal Justice & Public Safety Division
Office of the Attorney General
202 North 9th Street
Richmond, Virginia 23219
(804) 225-2206
(804) 786-4239 (Fax)
Email:  moshea@oag.state.va.us
*Counsel for Defendant*

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

PROCEDURAL BACKGROUND ............................................................................ 4

APPLICABLE LEGAL STANDARDS:  POST-TRIAL MOTIONS ................... 22

APPLICABLE LEGAL STANDARDS:  MAGISTRATE REFERRALS ........... 23

ARGUMENT ............................................................................................................ 27

   I.    THE MAGISTRATE'S DENIAL OF THE MOTION FOR SANCTIONS SHOULD BE UPHELD ... 28

      A.    This Court applied an incorrect standard when considering the Plaintiff's objections to the spoliation ruling ........................................................ 28

      B.    When the proper standard of review is applied, the magistrate judge's ruling on the spoliation motion should be upheld. ........................................ 30

      C.    This Court incorrectly concludes that there was "spoliation" of evidence by VDOC. ............................................................................................ 33

      D.    Any duty to preserve and breach of duty by other persons within VDOC cannot be imputed to Defendant Gwinn. ............................................ 41

      E.    Imposing discovery sanctions for the stated purpose of punishing an executive-branch state agency violates the Eleventh Amendment. ..................... 51

      F.    The Plaintiff failed to carry his burden of establishing that the missing evidence was prejudicial to him. ........................................................ 53

      G.  The Court selected what is, in effect, an adverse inference sanction, but without also an express finding of intent to deprive, thereby violating F.R.C.P. 37(e). .............. 62

  II.    THIS COURT IMPROPERLY REJECTED THE MAGISTRATE'S CREDIBILITY FINDINGS .64

  III.    THIS COURT SHOULD ACCORD APPROPRIATE DEFERENCE TO THE MAGISTRATE'S CREDIBILITY FINDINGS AND ACCEPT THE MAGISTRATE'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ............................................................ 67

  IV.    OBJECTIONS TO SPECIFIC FINDINGS OF FACT ............................................ 69

CONCLUSION ........................................................................................................ 71

# INTRODUCTION

Plaintiff Lameek Johns, an inmate within the Virginia Department of Corrections (VDOC), filed suit against Defendant Gwinn, a corrections officer at Red Onion State Prison (ROSP), claiming that Defendant Gwinn used oleoresin capsicum (o/c) spray against him, without provocation or excuse, and thereby violated his rights under the Eighth Amendment. Following an exchange of discovery, Johns also filed a motion seeking spoliation sanctions, contending that VDOC's failure to save a videotape of an interaction between the two parties constituted sanctionable spoliation of evidence.  Defendant Gwinn filed a response in opposition, with supporting materials.  The case was set for trial, and this Court referred the matter to a magistrate judge for an evidentiary hearing, during which live testimony was taken.  The magistrate judge also heard arguments on the pending pretrial motion seeking spoliation sanctions, which had also been referred to the magistrate for adjudication.  Following the presentation of testimony and evidence, the magistrate submitted a report and recommendation, setting forth proposed findings of fact and conclusions of law.  In that report and recommendation, the magistrate expressly found the testimony presented by the Defendant and his witnesses to be credible and consistent, and discredited the testimony presented by the Plaintiff and his witness.  Noting that the Court had heard testimony from individuals who watched the surveillance video before it was recorded over, and that testimony did not support the version of events presented by the Plaintiff, the magistrate also denied Plaintiff's motion for spoliation sanctions, reasoning that he had not carried his burden of proving that the lost evidence would have been favorable to him.

Upon consideration of the magistrate's report, this Court—based solely on the trial transcript and written record of this case—has rejected those findings, concluding instead that the Plaintiff's testimony was credible, finding that the failure of an agency to save evidence was

imputable to the lone, individual-capacity employee who is a defendant in this case, and awarding judgment in favor of the Plaintiff. The Court has elected to award $3000 in compensatory damages, which may or may not be covered through the Commonwealth's Division of Risk Management within the Department of the Treasury, and $1000 in punitive damages—which, as counsel noted at trial, will not be.

By disregarding the credibility findings of the magistrate judge, which were based upon the presentation of live testimony at the evidentiary hearing, this Court has erred as a matter of law. As the Supreme Court has noted, rejecting a magistrate's credibility determinations "when those findings are dispositive," and instead substituting the district court judge's "own appraisal . . . without seeing and hearing the witness[es]," gives "rise to serious questions," implicating the due process rights of the litigants. *United States v. Raddatz*, 447 U.S. 667, 681 n.7 (1980). For this reason, every federal Court of Appeals to have addressed this question has determined that it constitutes reversible error to reject a magistrate's credibility findings, made after hearing live testimony, based solely on the written record.[1] Accordingly, if this Court questions the credibility findings of the magistrate judge, the proper remedy is not to reject those findings

---

[1] This rule has been endorsed by the First, Second, Third, Fifth, Seventh, Ninth, and Eleventh Circuits. The Sixth Circuit has treated this as an "open question," although acknowledging that, at the very least, "it would seem that the best practice for a district court would be to hold a new hearing before rejecting a magistrate judge's credibility determination." *United States v. Johnson*, 631 F. App'x 299, 301 n.1 (6th Cir. 2015). The Tenth Circuit has recognized the basic premise, although it does not appear to have directly applied the rule. *See Wildermuth v. Furlong*, 140 F.3d 856, 857 (10th Cir. 1998); *United States v. McCall*, No. 97-5054, 1998 U.S. App. LEXIS 143, at *6-7 (10th Cir. Jan. 6, 1998). The Fourth Circuit has not directly considered this question, although at least one jurist has recognized and endorsed it, *see United States v. Johnson*, 107 F. App'x 322, 331 (4th Cir. 2004) (Duncan, J., dissenting), and it has been applied by other district courts within this Circuit, *see, e.g.*, *United States v. Michaels*, No. 5:19CR31, 2019 U.S. Dist. LEXIS 218832, at *8 (N.D. W. Va. Dec. 20, 2019). "No circuits appear to have rejected the rule in question." *Johnson v. Finn*, 665 F.3d 1063, 1074 n.5 (9th Cir. 2011).

outright, but rather, to convene a separate hearing so that this Court may hear and resolve the testimony of the witnesses for itself, prior to entering a final judgment.

Additionally, this Court erred by determining, under the circumstances of this case, that an employer's failure to save evidence should be held against a low-level employee who has no ability to access or otherwise control the disposition of that evidence. To reach this decision, the Court effectively found that the VDOC employees who watched the surveillance video must have lied under oath about what they witnessed on that video. Again, this credibility determination is contrary to the decision reached by the magistrate judge, which has been improperly set aside based solely on the written record. Moreover, the court's opinion does not apply the proper of standard review as to the magistrate's decision on this pre-trial discovery matter, which was referred under 28 U.S.C. § 636(b)(1)(A) rather than § 636(b)(1)(B), and is therefore not subject to *de novo* review. Rather, the magistrate's decision on this question must stand unless it is clearly erroneous or contrary to the law—which it is not.

For these reasons, and those discussed in more detail below, Defendant Gwinn respectfully requests that this Court grant his motion and vacate the opinion and final order entered on November 30. As to the motion seeking sanctions for spoliation of evidence, when the appropriate deferential standard of review is applied, the magistrate's findings should be accepted because they are not clearly erroneous or contrary to established law. With respect to the disposition of the substantive allegations in this case, Defendant requests that this Court either: (1) giving appropriate deference to the magistrate's credibility determinations, accept the corresponding findings of fact and conclusions of law and enter judgment in favor of the Defendant; or (2) convene a new evidentiary hearing, during which this Court can assess the credibility of the witnesses for itself, prior to entering final judgment in this matter.

## PROCEDURAL BACKGROUND

Plaintiff Lameek Johns, a prisoner incarcerated withing VDOC, filed his pro se civil complaint under 42 U.S.C. § 1983, alleging that Defendant Gwinn, a corrections officer, used excessive force against him and, therefore, violated his Eighth Amendment rights.  Defendant Gywnn, who was sued solely in his individual capacity, filed an answer to the complaint, denying the Plaintiff's allegations (ECF No. 11).  In response to a court order directing the Defendant to submit a motion for summary judgment (ECF No. 15), Defendant Gwinn represented to the Court that the available evidence would be insufficient to carry his burden of proof as to a motion for summary judgment, because the "case presents a credibility determination best determined by a trier of fact."  (ECF No. 18).  Defendant Gwinn also provided the Plaintiff with responses to his discovery requests.  *See* Defendant's Response to Court Order, ECF No. 30 (noting that responses to the Plaintiff's discovery requests were provided in September 2018, and attaching copies of those responses).

The Plaintiff next submitted a "Motion for Judgment," (ECF No. 31), construed as a motion for summary judgment, to which Defendant Gwinn submitted a response in opposition, supported by sworn affidavits.  (ECF No. 38)  This Court subsequently entered a memorandum opinion denying the Plaintiff's motion for summary judgment, concluding that there were genuine issues of material fact precluding summary judgment in favor of the Plaintiff.  (ECF No. 51)  The case was then referred to a magistrate for "further proceedings, including a bench trial," pursuant to 28 U.S.C. § 636(b)(1)(B).

1.

While the motion for summary judgment was pending, the Plaintiff also filed a "Motion for Spoliation for Holding and Sanction," (ECF No. 44), based on the fact that prison surveillance video that would have depicted, to some extent, any interaction between the Plaintiff

and the Defendant on the relevant date (April 5, 2016), had not been saved by prison authorities. In his spoliation motion, the Plaintiff contended that "[t]he Defendant has been put on notice of the aforesaid civil action since May 16, 2018," following the filing of this suit "on or about March 29, 2018."  Although evidently conceding that this particular Plaintiff was therefore unaware of the prison video in time to have it preserved, the Plaintiff contended that Unit Manager Walter Swiney, a non-party, "reasonably should have anticipated litigation and preserved the Rapid Eye Footage evidence relevant to the underlying dispute" when Mr. Swiney reviewed that footage.  (ECF No. 44-3).  The Plaintiff further contended that Mr. Swiney (not the Defendant) destroyed the surveillance video in "bad faith."  (*Id.*)   As a sanction, the Plaintiff requested entry of default judgment.  (ECF No. 44)

Defendant Gwinn filed a response in opposition, supported by affidavits and exhibits. (ECF No. 48)  In his response, Defendant Gwinn explained that Unit Manager Swiney reviewed the surveillance video soon after the alleged incident.  (ECF No. 48, p. 2)  Mr. Swiney did not observe any use-of-force incident on the surveillance video, and, accordingly, he did not refer that footage to the institutional investigator to be saved.  (ECF No. 48, p. 2, 4)  As Mr. Swiney explained in his attached affidavit, the prison surveillance video system periodically records over itself, so if a video clip is not downloaded and saved into a permanent format, it will be recorded over in the ordinary course of business.  (ECF No. 48, pp. 2-3).  Mr. Swiney also explained that, although offenders are allowed to request that prison surveillance video be retained, the Plaintiff had not done so.  (ECF No. 48, p. 3).   Defendant Gwinn also submitted a sworn affidavit averring that he has no authority to access the prison surveillance video, nor does he have the ability or authority to preserve video footage from that system.  (ECF No. 48-3, pp. 4-5)

Based on the evidence presented, Defendant Gwinn argued that there was no "spoliation" of evidence because he did not have the duty or the ability to preserve the prison surveillance video.  Defendant Gwinn also contended that he did not willfully engage in any conduct resulting in the loss of the evidence, nor—at the time the evidence was lost—did he have actual or constructive knowledge that the surveillance video might be relevant to future litigation. Defendant Gwinn further argued that, even if the Court were to determine that there had been "spoliation" of evidence, the sole remedy requested by the Plaintiff—default judgment—was precluded under the plain language of Rule 37(e).  Defendant Gwinn also noted that, because other individuals who had viewed the surveillance video would be available to testify at trial, and because the Plaintiff had other avenues of obtaining discovery, the Plaintiff could not carry his burden of showing the substantial prejudice needed to justify an award of sanctions.  (ECF No. 48, pp. 10-11).

The Notice of Electronic Filing accompanying submission of this motion reflected that the motion was referred to Magistrate Judge Hoppe (ECF No. 44), who had been assigned to the case pursuant to standing order 2018-9 (ECF No. 22).  Under standing order 2018-9 (now supplanted by standing order 2020-16), all "nondispositive, pretrial matters and motions" in prisoner cases "are referred to a magistrate judge, pursuant to 28 U.S.C. § 636(b)(1)(A), for purposes of consideration and ruling."

In a subsequent order, the Magistrate Judge Hoppe noted that he was taking the Plaintiff's motion for spoliation sanctions under advisement pending the scheduled evidentiary hearing on the merits of the case, at which point he would also consider arguments and evidence on the pretrial motion.  (ECF No. 57)

2.

The parties appeared for the scheduled evidentiary hearing on August 5, 2019.  The evidence presented by the Plaintiff in support of his case may be summarized as follows:

The Plaintiff first called another inmate, Michael Watson, to testify on his behalf.  (Tr. p. 7, at 22).  Mr. Watson testified that, during pill pass that morning, he heard a nurse tell Defendant Gwinn that the Plaintiff "was masturbating in his cell while she was signing his chart."  (Tr. p. 10, at 3-4)  Mr. Watson said that he then heard the tray slot open on the Plaintiff's door, and then "heard Johns holler, He done shot me in my face with some pepper spray," and "started yelling for the nurse, saying, I know you seen him shoot that pepper spray in my face," (Tr. p. 10, at 7-10).  After "[a]bout 60 seconds," Mr. Watson said that he could smell the spray "coming through the vent."  (Tr. p. 10, at 12-13).  He also testified that the Plaintiff was "hitting the intercom, yelling and trying to get them to get his attention so he could receive some medical help," but Sergeant Woods—the control booth officer—"basically paid Johns no attention."  (Tr. p. 10, at 19-24)  Mr. Watson also testified that Sergeant Fleming and Unit Manager Swiney both responded to the housing unit after that, (Tr. p. 12, at 14-15), and Mr. Watson was then taken to shower.  (Tr. p. 12, at 23-24).  On cross-examination, Mr. Watson testified that approximately "15, 20 seconds" passed between when the o/c spray was first used, and when he heard "Mr. Johns shouting in his cell."  (Tr. p. 17, at 17-19).  He further testified that the Plaintiff continued shouting for "about 45 minutes or so."  (Tr. p. 17, at 20-23).  Mr. Watson admitted that he was a convicted felon who had previous convictions for crimes or moral turpitude.  (Tr. pp. 19-20)

The Plaintiff, testifying on his own behalf, said that, around 7:00 a.m. on April 5, 2016, he heard two nurses being escorted into the housing unit by Defendant Gwinn.  (Tr. p. 22, at 1-5).  The Plaintiff testified that he had an exchange of words with Defendant Gwinn, who referred

7

to him as a "bitch" and said that he was going to "come up in that cell" and "make you my bitch." (Tr. p. 22, at 18-22). The Plaintiff said that, after Defendant Gwinn arrived at Mr. Watson's cell, he then "ran back" to the Plaintiff's cell, "removed his OC spray cannister from his holster," then "opened up [his]feeding box and [his] tray slot," "stuck his arm all the way through the tray box with the cannister of OC spray in his hand and sprayed [the Plaintiff] in his face." (Tr. p. 23, at 3-10). The Plaintiff testified that the two nurses observed the interaction, but they stood around and did nothing. (Tr. p. 23, at 16-20). The Plaintiff also said that he pressed the intercom button "to get the booth officer attention," (Tr. p. 23, at 23-25), and "told him that [he] was just gassed by Officer Gwinn and . . . need[ed] medical attention." (Tr. p. 24, at 4-8). The Plaintiff claimed that Officer Williams, the control booth officer, "answered the intercom," but "was just ignoring [him]," "laughing and giggling and joking real loud." (Tr. p. 24, at 8-15).

The Plaintiff testified that Defendant Gwinn then returned with Officer Lewis, and that he told Officer Lewis "that CO Gwinn had sprayed [him] . . . and [he] needed medical attention." (Tr. p. 24, at 18-25; p. 25, at 1-3). The Plaintiff said that Officer Lewis also "ignored" him. (Tr. p. 25, at 3). The Plaintiff claimed that Sergeant Fleming then entered the housing unit, and he told Sergeant Fleming that "CO Gwinn had just gassed me," and that, in response, Sergeant Fleming "pulled out his OC spray as if he was about to spray me, too, for no reason." (Tr. p. 25, at 5-10). The Plaintiff also testified that Sergeant Fleming then began to call him "a baby raper, a rapist, a child molester, all kind of different names." (Tr. p. 25, at 13-14; p. 48, at 16-18). According to the Plaintiff, Sergeant Fleming then told the Plaintiff to "pack [his] stuff up." (Tr. p. 25, at 16). Sergeant Fleming, Unit Manager Swiney, and Sergeant Owens then re-entered the housing unit and escorted him to a different building. (Tr. p. 25, at 22-25; p. 26, at 1-5). The

Plaintiff further claimed that these employees used a handheld video to record his transit to the new housing unit.  (Tr. p. 25, at 5-12).

The Plaintiff testified that, when he arrived at the new housing unit, he told a captain that he had been "exposed to OC spray" and that he had not been decontaminated.  (Tr. p. 27, at 5-8).  In response, the captain had a nurse "come assess" the Plaintiff.  (Tr. p. 27, at 8-11).  After the nurse spoke with the Plaintiff, "she had the officers actually place [him] in the shower."  (Tr. p. 27, at 19-20).

On cross-examination, the Plaintiff admitted that he had been progressing through the Step-Down Program at Red Onion State Prison, but—two days before the claimed incident here—had received a disciplinary infraction that resulted in his being placed in a segregated housing unit.  (Tr. p. 29, at 17-25).  Because of a recent ICA hearing, he was aware, as of April 5, 2016, that he was going to be moved to a different housing unit relatively soon.  (Tr. p. 31, at 1-3).  The Plaintiff admitted that he had never had any negative interactions with Defendant Gwinn prior to April 5, 2016.  (Tr. p. 34, at 15-20).

The Plaintiff also described the feeding box apparatus attached to his door—specifically, there is a feeding box that physically sticks out from the cell door, that has a hinged top that lifts up.  (Tr. p. 36, at 14-17).  Inside the feeding box itself, there is a different slot that has to be unlocked and opened to access the inside of the cell.  (Tr. p. 36, at 20-23).  To open that part of the feeding box, an officer has to unlock and slide open a separate piece of metal covering that slot.  (Tr. p. 37, at 4-7).  The feeding box is about 18 inches deep, and it is large enough to accommodate a meal tray.  (Tr. p. 37, at 13-20).

The Plaintiff testified that, while he was standing by his cell door, he watched as Defendant Gwinn opened the feeding box and the tray slot, but he did not move back or

otherwise question what was going on.  (Tr. p. 39, at 3-8).  The Plaintiff claimed that Defendant Gwinn stuck his arm into the feeding box, all the way through the box and through the tray slot and into the cell, and repeatedly sprayed him with the o/c spray, for "like two to three minutes." (Tr. p. 39, at 12-25; p. 40, at 1).  The Plaintiff said that, while Defendant Gwinn was repeatedly spraying him with the o/c spray, he continued to stand by the cell door, and did not back away. (Tr. p. 40, at 8-14).  The Plaintiff claimed that, during this two to three minute period of time, when he was allegedly being repeatedly hit in the face and bare chest by squirts of o/c spray, he stayed quiet, and did not yell, scream, shout, or otherwise say anything.  (Tr. p. 41, at 20-25; p. 42, at 5-7).  He testified that he did not use the sink in his cell to try and wash off the o/c spray because he wanted medical attention instead.  (Tr. p. 43, at 16-18).  He admitted, though, that he knew he could use water to wash o/c spray off of his skin.  (Tr. p. 44, at 15-17).

The Plaintiff further testified that, after this interaction, he was "screaming" at Officer Gwinn and Officer Lewis as they were bringing the top tier offenders down to the bottom tier for showers, a process that takes five to seven minutes per inmate.  (Tr. p. 46, at 4-7, 22-25).  He admitted that, of the eight employees he claimed ignored his shouting for medical attention on that date (two nurses, three corrections officers, two sergeants, and a unit manager), he had never had a negative interaction with any of them.  (Tr. p. 53, at 3-8).

The Plaintiff also admitted that he and Mr. Watson, his witness, had been housed together in the previous housing unit (D5), the segregation housing unit (D3), and then the housing unit that they were both moved to on April 5, 2016 (B3).  (Tr. p. 31, at 4-17).  He also admitted that he was a convicted felon who had been convicted of crimes involving moral turpitude.  (Tr. p. 54, at 3-5).  The Plaintiff then rested his case.

Defendant Gwinn then called multiple witnesses to testify about their conduct on April 5, 2016. The evidence presented by the defense may be summarized as follows:

Defendant Gwinn, testifying on his own behalf, stated that he could recall having an interaction with the Plaintiff on this particular date. (Tr. p. 59, at 15-18). Specifically, Defendant Gwinn remembered seeing the Plaintiff standing "up on his sink" at one point. (Tr. p. 59, at 23-24). Because it appeared to Defendant Gwinn that the Plaintiff had "his hand either on the wall or near the sprinkler head," Defendant Gwinn though that the Plaintiff was "going to break the sprinkler head." (Tr. p. 60, at 1-3). This was a concern because, if an inmate is able to break a sprinkler head, water comes out of that system, "into their cell and floods their cell and runs out and floods the pod." (Tr. p. 59, at 24-25; p. 60, at 1). This is something that inmates have been known to do. (Tr. p. 61, at 2-4). Because of his concern, Defendant Gwinn stopped at the cell door and "said something to [the plaintiff]," which he recalled as being, in essence, "just to get down." (Tr. p. 61, at 8-10). The Plaintiff complied. Defendant Gwinn could not recall if he had removed his o/c spray from its holster during that interaction. (Tr. p. 61, at 18-21) ("I don't remember if I did or I didn't."). However, Defendant Gwinn definitively testified that he did not spray it. (Tr. p. 62, at 8-9). He further testified that he did not open the feeding box or the tray slot during this interaction. (Tr. p. 62, at 15-17). Defendant Gwinn stated that he had not had any meaningful interactions with the Plaintiff prior to that date, and, in fact, would not have known who he was by name. (Tr. p. 62, at 18-25; p. 62, at 1).

Defendant Gwinn also described the process for opening the feeding box and the slider on the cell door, clarifying that it takes two hands to open the latch on the feeding box and then "flip" the lid open. (Tr. p. 63, at 21-4). This is not an action that could be performed while holding o/c spray in one hand. (Tr. p. 63, at 25; p. 64, at 1-2).

Defendant Gwinn further testified that, as of April 5, 2016, he had been with VDOC for about a year.  During his year with VDOC, he had not used o/c spray on any inmate, and he definitively testified that he did not use o/c spray on the Plaintiff on that date.  (Tr. p. 64, at 10-17; p. 76, at 3-5).  Defendant Gwinn additionally averred that, if he had used o/c spray on an inmate, he would have documented that interaction in the pod logbook.  (Tr. p. 64, at 18-22).  The pod logbook from that date was introduced into evidence as Defense Exhibit 1, and there were no entries reflecting that o/c spray had been used in the housing unit on that date.  (Tr. p. 67, at 9-19).  Defendant Gwinn also testified that, if he had used o/c spray on an inmate, he would have completed an internal incident report to document that action.  (Tr. p. 67, at 20-25; p. 68, at 1-8).  Defendant Gwinn explained that he did not do an internal incident report to document the fact that he had seen the Plaintiff standing on his sink "because he complied," and "got down" when he was instructed to do so.  (Tr. p. 68, at 11-15).  He did not write a disciplinary charge for the same reason.  (Tr. p. 68, at 16-23).

Defendant Gwinn denied having referred to the Plaintiff as a "bitch" or having used any similar language whatsoever.  (Tr. p. 69, at 2-10).  He also explained that it would be "pretty foolish" for an officer to stick his arm through a feeding box, through a tray slot, and into an inmate's cell, because the inmate could "grab ahold of your arm and break your arm."  (Tr. p. 69, at 11-21; Tr. p. 76, at 5-7) ("[T]o stick your hand all the way in with a can of gas in the cell, that would be really, really be dumb.").  Defendant Gwinn further explained that he is not authorized to request approval for the use of o/c spry from the medical department, because that request has to come "from a sergeant or above."  (Tr. p. 72, at 15-16).

Sergeant Fleming was also called to testify on behalf of Defendant Gwinn.  As of April 5, 2016, Sergeant Fleming was the building supervisor for housing unit D at Red Onion States

Prison.  (Tr. p. 77, at 5-8).  Sergeant Fleming explained that, in the housing unit where the

Plaintiff had been located prior to that date (D5), the inmates are allowed greater freedom and

privileges than inmates in housing unit D3, which is operated as a segregation unit.  (Tr. p. 78, at

3-21).  Sergeant Fleming testified that, during his security round, which he made around 7:10 in

the morning, he approached the Plaintiff to advise that he had been "reclassified" and was being

moved to a different building.  (Tr. p. 79, at 24-25; p. 80, at 1-2).  At that time, according to

Sergeant Fleming, the Plaintiff stated that "he was not going" to be moved.  Accordingly,

Sergeant Fleming contacted the medical department to obtain authorization for use of o/c spray,

"in case there was any further incident."  (Tr. p. 80, at 5-13).  Sergeant Fleming said he then left

that particular pod of the housing unit, but returned a little later "to assist staff in moving

offender Johns to B3."  (Tr. p. 81, at 15-16).

Sergeant Fleming recalled that, when the Plaintiff was brought into the vestibule area

of the housing unit, he claimed that o/c spray had been used on him.  (Tr. p. 81, at 23-25; p. 82,

at 1-3).  Upon reentering the housing unit, he was unable to detect any "odor of OC utilization."

(Tr. p. 82, at 19).  Sergeant Fleming also did not observe any physical indications that the

Plaintiff had been exposed to o/c spray.  (Tr. p. 82, at 20-25; p. 83, at 1).  No other offender

complained that o/c spray had been used in the housing unit that date, which is something that he

would expect to occur if the spray had been used, since "[i]t tends to irritate other offenders in

the housing unit." (Tr. p. 84, at 22-25; p. 25, at 1-11).  Sergeant Fleming further explained,

relative to the o/c spray, that there are "twelve bursts, max, in a can" of o/c spray, and that each

burst is "a second to a half-second."  (Tr. p. 25, 17-19).  In other words, "[i]t runs out quick."

(Tr. p. 25, at 21).

Sergeant Fleming denied having referred to the Plaintiff as a "baby raper or a child molester," and he verified that, if he believed at any time that o/c spray had been used on the Plaintiff, he would have reported and documented the incident.  (Tr. p. 85, at 25; p. 86, at 1-5).  He could not recall a handheld video being used to document the Plaintiff being transferred to another housing unit.  (Tr. p. 85, at 16-22).

On cross-examination, and when asked to explain his response to an informal complaint,[2] Sergeant Fleming verified that he "reviewed RapidEye footage" of the incident after the Plaintiff made his complaint in the vestibule, and based on his review of the video footage, there was no evidence supporting the Plaintiff's claim that o/c spray had been used against him on April 5, 2016.  (Tr. p. 89, at 13-21).  Sergeant Fleming further documented that, having reviewed the video footage, neither the feeding box nor the tray slot to the Plaintiff's door was accessed by Defendant Gwinn on that date.  (Tr. p. 90, at 14-21).

Officer Lewis was also called to testify on behalf of the Defendant.  On April 5, 2016, he was working as a floor officer in the D housing unit at Red Onion State Prison.  (Tr. p. 95, at 10-14).  He did not recall the Plaintiff ever claiming, on that date, that o/c spray had been used against him.  (Tr. p. 96, at 1-4).  Officer Lewis also explained that he did not detect the scent of o/c spray in the housing unit that date, describing it as a "very pungent smell," so "[y]ou can walk in a pod and you can smell and tell whether OC has been administered."  (Tr. p. 96, at 8-16; p. 97, at 1-3).  Officer Lewis also stated that no other inmates in that housing unit complained to him that o/c spray had been used on April 5, 2016.  (Tr. p. 96, at 20-22).

Sergeant Williams, called to testify on behalf of the Defendant, verified that, as the assigned gun post officer, he would have been in the control booth on April 5, 2016.  (Tr. p. 100,

---

[2] Plaintiff's Exhibit One.

at 5-9).  After describing the basic layout of the control booth, relative to the pods in the housing

unit, Sergeant Williams noted that the control booth has "windows that you can open and shut,"

and "[i]t's standard for the windows to be open at all times so you can hear what's going on."

(Tr. p. 102, at 4-8).  Sergeant Williams also explained that each offender has an intercom button

inside his cell, and when that button is activated, a light on a panel is illuminated in the control

both, and the panel begins beeping to notify the control booth officer that an inmate is attempting

to communicate with him.  In order to turn off the beeping noise, the control booth officer

presses the intercom button, which activates the microphone in the cell, and makes it so that the

control booth can hear what is going on inside the offender's cell.  (Tr. p. 102, at 23-25; p. 103,

at 1-6).  Sergeant Williams verified that, if the Plaintiff had used the intercom system to request

decontamination, he would have notified the building sergeant and documented the request in the

control booth logbook.  (Tr. p. 103, at 20-35; p. 104, at 1-2).

Sergeant Williams further explained that, because the windows from the control booth

open up into the housing units, when o/c spray is used, the control booth officers are able to

smell it.  (Tr. p. 104, at 10-15).  He verified that o/c spray had not been used in the D building on

April 5, 2016, because he "would have smelled it," "would have remembered it," and "would

have had to write a report about it."  (Tr. p. 104, at 16-21).  He further testified that, if an officer

had been in front of an offender's door with "both the feeding box open and the tray slot open,

with his arm physically inserted inside the cell for a period of two to three minutes," that this is

something he would have noticed from his post, documented, and "would have possibly been

inclined to call for help."  (Tr. p. 108, at 4-13).

Officer Mullins, the control booth officer on April 5, 2016, was also called to testify on

behalf of the Defendant.  Officer Mullins testified that he did not see or observe anything to

15

indicate that o/c spray had been used in the D housing units on that date, noting that he would have detected the use of the spray because it "has a real strong smell and it also makes you choke up and it makes your eyes water." (Tr. p. 111, at 15-25). Officer Mullins denied ever detecting the scent of o/c spray, and he denied having received any complaint from the Plaintiff through the intercom system regarding an alleged use of o/c spray. (Tr. p. 112, at 1-7). Officer Mullins further noted that there was no entry in the control booth logbook (Defense Exhibit Two) indicating that o/c spray had been used in the housing unit on that date. Officer Mullins also agreed that, if there had been an officer standing in front of the Plaintiff's cell with the tray feeder box and the tray slot open, with his arm inside the Plaintiff's cell, that is something he would have made note of, and something that would have caused him to contact the building sergeant, because, "per policy, there's no reason to have your arm through a tray slot box," and officers are not "supposed to have both the slider and the box open at the same time." (Tr. p. 113, at 1-14). On redirect, Officer Mullins verified that, if an offender had been continuously shouting for assistance or medical attention, this is something he would have heard in the control booth and would have made note of in the control booth logbook. (Tr. p. 118, at 12-24).

Finally, Unit Manager Swiney was called to testify on behalf of the Defendant. Mr. Swiney verified that he had completed an ICA review of the Plaintiff on April 4, 2016, and that the Plaintiff was being reclassified from security level 6, a population-style unit, back to security level "S", or administrative segregation. (Tr. p. 120, at 21-25; p. 121, at 1). Mr. Swiney recalled having the Plaintiff complain to him, in the vestibule of the housing unit, that he had been sprayed with o/c spray. (Tr. p. 121, at 11-19). Mr. Swiney testified that, in response to that complaint, he first observed the Plaintiff, and he saw no signs of distress, no reddened skin, no reddened eyes. (Tr. p. 121, at 24-25; p. 122, at 1). Mr. Swiney explained that this was notable

because "[e]xposure to OC spray is going to cause a reaction to your mucous membranes. You're going to tear up.  Your nose is going to run.  You're going to cough."  (Tr. p. 122, at 2-7).  Mr. Swiney stated that he next went to the Plaintiff's assigned cell, where he was not able to detect any odor of o/c spray, nor did any of the other offenders complain that o/c spray had been used in the housing unit. (Tr. p. 122, at 14-20).  After checking the cell and rounding through the housing unit, Mr. Swiney then went back to his office to pull up the RapidEye surveillance video to further investigate the Plaintiff's allegations.  (Tr. p. 122, at 24-25).  Mr. Swiney explained that there were three camera views depicting the interior of that housing unit, and he watched them all, from the start of the shift until the Plaintiff was taken out of the unit.  (Tr. p. 122, at 10-17).  Mr. Swiney affirmatively testified that the RapidEye video did not depict any officer spraying the Plaintiff with o/c spray.  (Tr. p. 123, at 18-22).  With respect to Officer Gwinn, Mr. Swiney recalled that "[t]here was one moment in the video that you can see Officer Gwinn stop at his cell, [and it] appeared that he may have removed his OC from the holster and then replaced it immediately, and then continue his round."  (Tr. p. 123, at 23-25; p. 124, at 1-3).  However, Mr. Swiney was able to verify that, "[a]t no time was the tray slot accessed," which was something that he would have been able to see on the video.  (Tr. p. 124, at 3-7).

Mr. Swiney explained that he did not save or download the video clip from the RapidEye system, but he did "inform[] the investigator of John's complaint and let him know that I reviewed the video and [saw] nothing."  (Tr. p. 124, at 8-12).  Mr. Swiney further verified that there was no handheld video camera being used while the Plaintiff was being removed from the building, and that he did not accompany the Plaintiff to the B housing unit, so he could not testify to anything that might have happened in that building.  (Tr. p. 125, at 1-12).

17

On cross-examination, Mr. Swiney also explained that the institutional investigator has the responsibility to save copies of videos depicting incidents involving offenders, and that the institutional investigator will also save videos "upon request of the inmate for preservation of the evidence." (Tr. p. 126, at 22-24).  If, for example, the video had shown an "officer place his arm into a tray slot and use OC on an offender, that would definitely be an incident," because that would constitute a use of force sufficient to trigger the preservation policy.  (Tr. p. 128, at 6-10). Mr. Swiney also noted that he had been with VDOC for 19 years, and during the course of his employment, had never been subjected to any disciplinary actions.  (Tr. p. 130, at 17-20).

At the conclusion of the hearing, following oral arguments, the magistrate judge expressly noted that he found "Officer Gwinn and the other defenses witnesses" to have been "credible," and that "[t]heir stories matched up and made sense." (Tr. p. 164, at 5-7).  By contrast, he did not find the Plaintiff's version of events to have been "persuasive." (Tr. p. 163, at 22).

4.

In his subsequent report and recommendation, the magistrate recommended that the Court enter judgment in favor of the Defendant.  (ECF No. 70)  After extensively summarizing the trial testimony, the magistrate set forth a numbered list of proposed findings of fact, adopting the version of events that had been presented by the Defendant and his witnesses.  In describing the testimony of the Plaintiff, the magistrate opined that the Plaintiff's version of events was "so outlandish that I cannot accept it at face value." (ECF No. 70, p. 24).  By contrast, the magistrate noted that the Defendant's witnesses "testified consistently," and their testimony "comported with how one would expect a reasonable corrections officer to behave around high-security prisoners." (ECF No. 70, p. 24).  The magistrate specifically found that the testimony presented

by Mr. Swiney and Sergeant Fleming was "credible and consistent," as to the video footage they reviewed.  (ECF No. 70, p.25)  The magistrate also noted that the Plaintiff's "contrary version of events" was "internally inconsistent."  (ECF No. 70, p. 24)  The magistrate expressly discredited the Plaintiff's testimony that he "just stood there stoically for 2 to 3 minutes while Gwinn doused his face and bare chest with a caustic chemical," and found that the Plaintiff's testimony that he did not even try "to wash the chemical off his body . . . belies his testimony that he was ever exposed to the gas."  (ECF No. 70, p. 25)  Finally, the magistrate noted that the defense witnesses "testified consistently that they did not detect any signs of OC on John's person, in cell D-307, or anywhere in the D-3 pod."  (ECF No. 70, pp. 25-26)  In sum, the magistrate concluded that the evidence "shows convincingly that Johns has failed to carry his burden to show by a preponderance of the evidence that Gwinn used any force against him on April 5, 2016."  (ECF No. 70., p. 26)

As to the motion for spoliation sanctions, the magistrate reasoned that the Plaintiff "has not presented any evidence that he asked ROSP officials to preserve the footage, or that ROSP officials themselves reasonably should have known the footage could be relevant to anticipated litigation."  (ECF No. 70, p. 27)  Considering that the video did not depict a version of events favorable to the Plaintiff's position in this litigation, the magistrate denied the spoliation motion, finding that the Plaintiff had not carried his burden of showing it was likely to be favorable to his case.  (ECF No. 70, p. 28)[3]

---

[3] It is clear that the magistrate understood the distinction between his ruling on the pretrial motion and his recommended disposition as to the substantive allegations, for he "denied" the motion for spoliation sanctions in a separate subsection of his opinion (Part IV) from the recommended findings of fact and conclusions of law (Part III). *See* ECF No. 70, p. 28.

5.

The Plaintiff submitted objections to the Report and Recommendation, essentially

objecting to all of the findings of fact, conclusions of law, and the ultimate recommended

disposition.  (ECF No. 73)  This Court, "[r]eviewing the trial testimony and other record

evidence *de novo*," determined that the Plaintiff's objections should be sustained—in essence,

determining that the magistrate should have believed the Plaintiff's version of events over those

presented by the Defendant.  (ECF No. 79, p. 1.)  That is, noting the parties' "competing

narratives," the Court elected to accept the version presented by the Plaintiff.  (ECF No. 79, p. 3)

The Court further determined that, "because the *Virginia Department of Corrections* did not

preserve relevant evidence, Plaintiff established that he was entitled to sanctions."  (ECF No. 79,

p. 1) (emphasis added).

With respect to the pretrial motion for spoliation, the Court accepted that this Defendant

"had neither the ability nor the responsibility in his capacity at Red Onion to save the video at

issue."  (ECF No. 70, p. 10).  But reasoning that VDOC "employs Defendant, it trains

Defendant, and through the Attorney General's office, it represents Defendant," and "appears to

control all evidence introduced in his favor," the Court found there was as "special relationship"

between the parties that made VDOC's failure to save the evidence imputable to this individual

defendant.  (ECF No. 70, pp. 11-12).  The Court further determined that the Plaintiff's

institutional grievances—in which he did not request preservation of the video footage—should

have made apparent to VDOC officials that the video "was clear and material to VDOC's

resolving Plaintiff's complaints against Defendant."  (ECF No. 79, p. 14)

After making a threshold finding of spoliation, this Court then reevaluated and reassessed

the credibility of the witnesses who testified at the evidentiary hearing, concluding that the

"weight of the evidence produced at trial" indicates that o/c spray must have been used against the Plaintiff on the date in question—and, ergo, the witnesses called by the Defendant must have perjured themselves when they testified as to its contents.  (ECF No. 79, p. 24).  Second-guessing the magistrate's explicit credibility determinations, this Court found that "the testimony of several defense witnesses lacked credibility on the stand," noting (for example) that the witnesses could not specifically recall, three years after the fact, exactly how many times, and when, they had walked past the Plaintiff's cell that morning, (ECF No. 79, p. 26), and—as to the testimony about the surveillance video—speculating that "it appears entirely possible if not probably Swiney was describing a wholly different encounter between Plaintiff and Defendant." (ECF No. 70, p. 27).  The Court also opined that Mr. Swiney, a 17-year VDOC employee and supervisor, had a "natural bias in favor of Defendant," and that he probably allowed this bias to "color his interpretation and description of the events he witnessed on the RapidEye video"—in other words, to lie under oath in favor of his subordinate employee.  (ECF No. 70, p. 27) Ultimately, because the Court believed, based on the written record, that the Plaintiff's testimony was "more consistent and credible than that of Defendant and the other Red Onion officers called as witnesses at trial," the Court concluded that "the weight of the evidence leads to the conclusion that Defendant did in fact use OC spray against Plaintiff on April 5, 2016, and as a result, the lost Rapid Eye video would have been favorable to Plaintiff's case."  (ECF No. 79, p. 30).

　　　　As a sanction for the loss of evidence, the Court decided to give "less weight" to the testimony of Sergeant Fleming and Mr. Swiney "regarding what they observed on the RapidEye Video."  The import of this sanction is not immediately evident, as—to find sanctionable loss of evidence in the first place—the Court evidently determined that their testimony was not credible

in the first instance.  (ECF No. 79, p. 30).  In other words, the Court appears to have interwoven the sanction into its legal analysis, putting the cart somewhat before the horse.

The Court then set forth findings of fact that differ from those proposed by the magistrate, rejecting testimony the magistrate had deemed credible and consistent, and accepting testimony that the magistrate had deemed inconsistent and implausible.  The Court then elected to award $3,000 in compensatory damages for the Plaintiff's "physical pain, emotional anguish and humiliation," and an additional $1,000 in punitive damages.  (ECF No. 79, p. 38)  A final order memorializing this decision was also docketed.  (ECF No. 80)

### APPLICABLE LEGAL STANDARDS:  POST-TRIAL MOTIONS

The Federal Rules do not recognize a general "motion to reconsider" challenging aspects of a final judgment in a civil case.  Rather, a timely motion calling into question the correctness of a district court judgment is properly considered under Rule 59(e) of the *Federal Rules of Civil Procedure*.  *MLC Automotive LLC v. Town of Southern Pines*, 532 F.3d 269, 280 (4th Cir. 2008).  Under Rule 59(e), a district court may grant a motion to alter or amend when, *inter alia*, action is needed to correct a clear error of law or prevent manifest injustice.  *Zinkand v. Brown*, 478 F.3d 634, 637 (4th Cir. 2007).  "Thus, Rule 59(e), in essence, gives the district court a chance to correct its own mistake if it believes one has been made."  *Id.*

Under Rule 52 of the *Federal Rules of Civil Procedure*, involving findings of fact entered by a district court following a non-jury trial, a court "may amend its findings" and "may amend the judgment accordingly."  Fed. Rule Civ. P. 52(b).  The primary purpose of this rule "'is to ensure that the trial court's findings of fact and legal reasoning are clear, cover the essential factual and legal points, and will be understood by the appellate court.'"  *Blick v. Shapiro & Brown, LLP*, No. 3:16cv00070, 2018 U.S. Dist. LEXIS 231291, at *2 (W.D. Va. Aug. 10, 2018) (quoting *Haberern v. Kaupp Vascular Surgeons Ltd.*, 151 F.R.D. 49, 50-51 (E.D. Pa. 1993)).

However, a motion under Rule 52(b) may additionally be used "to correct manifest errors of law or fact or to present newly discovered evidence." *Id.* (quoting *United States v. Carolina E. Chem. Co.*, 639 F. Supp. 1420, 1423 (D.S.C. 1986)).

Finally, under Rule 60(b) of the *Federal Rules of Civil Procedure*, a district court is empowered to "relieve a party or its legal representative from a final judgment, order, or proceeding" for any "reason that justifies relief." Fed. R. Civ. P. 60(b)(6). This provision supplies a "catch-all" clause, that may be invoked "when the reason for relief from judgment does not fall within the list of enumerated reasons given in Rule 60(b)(1)-(5)." *Aikens v. Ingram*, 652, F.3d 496, 500 (4th Cir. 2011) (en banc).

## APPLICABLE LEGAL STANDARDS:  MAGISTRATE REFERRALS

Under 28 U.S.C. § 636(b)(1)(A), "a judge may designate a magistrate judge to hear and determine any pretrial matter pending before the court," apart from specified motions that are potentially case-dispositive, such as motions for summary judgment, to dismiss an action for failure to state a claim, or to suppress evidence in a criminal in case. Where the magistrate makes a determination on a pretrial matter under section (b)(1)(A), the district court judge may reconsider or revise that decision only "where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A); *see also* Fed. R. Civ. P. 72.

A district court judge "may also designate a magistrate judge to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition . . . of prisoner petitions challenging conditions of confinement." 28 U.S.C. § 636(b)(1)(B). Proposed findings of fact and recommendations under this section shall be filed with the district court. 28 U.S.C. § 636(b)(1)(C). Where a party objects to the proposed findings and recommendations, the district court judge may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate

judge," and "may also receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.*

Accordingly, different standards apply when a district court judge is called upon to assess a magistrate's findings in a given case. For standard pretrial matters—such as discovery motions—the magistrate's determination is due deference, and may only be set aside if clearly erroneous or contrary to law. By contrast, where a magistrate hears evidence relating to a case-dispositive motion or a "prisoner petition[] challenging conditions of confinement," the district court judge reviews those case-determinative findings of fact and conclusions of law *de novo*.

That said, and as admonished by the Supreme Court, "courts must always be sensitive to the problems of making credibility determinations on the cold record." *United States v. Raddatz*, 447 U.S. 667, 679 (1980). A written record often "fail[s] to convey the evidence fully in some of its most important elements," for "[i]t cannot give the look or manner of the witness: his hesitation, his doubts, his variations of language, his confidence or precipitancy, his calmness or consideration," and therefore merely constitutes a "dead body of the evidence, without its spirit." *Id.* (internal quotations omitted). Although a district court judge may—consistent with the dictates of Article III and the Due Process Clause—therefore *accept* a magistrate judge's credibility findings without convening an additional hearing or hearing live testimony, different interests are implicated where those credibility findings are discarded by a judge who did not witness that live evidence for himself. For this reason, the Supreme Court has expressly opined that "it is unlikely that a district judge would reject a magistrate's proposed findings on credibility when those findings are dispositive and substitute the judge's own appraisal; to do so without seeing and hearing the witness or witnesses whose credibility is in question could well give rise to serious questions which we do not reach." *Id.* at 681 n.7.

Although the Fourth Circuit has not addressed the question to date, *see, e.g.*, *United States v. Johnson*, 107 F. App'x 322, 331 (4th Cir. 2004) (Duncan, J., dissenting), at least seven federal Courts of Appeals[4] have held that, where a district court judge questions the credibility determinations underlying a magistrate's proposed findings of fact and conclusions of law, the district court judge should convene an evidentiary hearing to consider the live testimony himself, rather than rejecting those credibility decisions outright as part of the *de novo* review—and that failure to do so constitutes reversible error. *See id.* (criticizing majority opinion for concluding that there were no credibility determinations in play, and recognizing that, if the Court were "to infer that the conclusions of the magistrate judge and district court rest on credibility determinations, it would be erroneous for the district court to supplant the magistrate judge's assessment with his own without holding a second evidentiary hearing"); *see also Jackson v. United States*, 859 F.3d 495, 498-99 (7th Cir. 2017) ("[A] district court judge may not reject the credibility findings of a magistrate judge without holding a de novo evidentiary hearing."); *United States v. Hernandez-Rodriguez*, 443 F.3d 138, 148 (1st Cir. 2006) ("Today we join our sister circuits when we find that, absent special circumstances, a district judge may not reject the credibility determination of a magistrate judge without first hearing the testimony that was the basis for that determination."); *United States v. Ridgway*, 300 F.3d 1153, 1157 (9th Cir. 2002); *United States v. Cofield*, 272 F.3d 1303, 1305-06 (11th Cir. 2001); *Cullen v. United States*, 194 F.3d 401, 407 (2d Cir. 1999) ("[A] district judge should normally not reject a proposed finding of a magistrate judge that rests on a credibility finding without having the witness testify before the judge."); *Hill v. Beyer*, 62 F.3d 474, 482 (3d Cir. 1995); *Louis v. Blackburn*, 630 F.2d 1105, 1109-10 (5th Cir. 1980) ("[L]ike the Supreme Court . . . we have severe doubts about the

---

[4] *See supra*, n.1.

constitutionality of the district court judge's reassessment of credibility without seeing and hearing the witnesses himself."); *see also United States v. Michaels*, No. 5:19CR31, 2019 U.S. Dist. LEXIS 218832, at *8 (N.D. W. Va. Dec. 20, 2019) ("[A] district court may not reject a magistrate judge's credibility findings without first conducting a *de novo* evidentiary hearing."). "No circuits appear to have rejected the rule in question." *Johnson v. Finn*, 665 F.3d 1063, 1074 n.5 (9th Cir. 2011); *see also id.* at 1074 ("Taking the Supreme Court's various hints, the First, Second, Third, Fifth, and Eleventh Circuits have all held that a district judge may not reject the credibility finding of a magistrate judge without holding a new evidentiary hearing.").

To be sure, many of these opinions arise in the context of criminal proceedings resolving pretrial motions to suppress or evidentiary matters pertaining to habeas petitions, *see, e.g.*, *Louis*, 630 F.2d at 1106, which implicate a criminal defendant's right to due process of law. Yet, under the Fifth Amendment, civil defendants, too, are entitled to due process of law, particularly prior to entry of a monetary judgment against them—a court-ordered deprivation of a protected property interest.[5] *See Boddie v. Connecticut*, 401 U.S. 371, 377-78 (1971) (discussing principles of due process applicable to civil proceedings); *see also Poche v. Joubran*, 389 F. App'x 768, 775 (10th Cir. 2010) ("Due process entitles a civil litigant to a fair trial."). The underlying rationale is therefore equally applicable in the present context: "One of the most important principles in our judicial system is the deference given to the finder of fact who hears the live testimony of witnesses because of his opportunity to judge the credibility of those

---

[5] In the context of a civil suit—such as this—filed under 42 U.S.C. § 1983, the claimed constitutional rights of the plaintiff are also implicated. *See, e.g.*, *Williams v. Blackburn*, No. 91-3373, 1993 U.S. App. LEXIS 39675, at *28 (5th Cir. Dec. 29, 1993) (finding rationale equally implicated in the context of a prisoner lawsuit alleging that his Eighth Amendment rights were violated through the use of excessive force, and "direct[ing] the district court to hold an evidentiary hearing on remand . . . if it rejects factual findings of the magistrate based upon credibility choices in ruling upon these claims").

witnesses. . . . [Although] [a]n exception to this general rule was created," allowing "a district judge [to] ***accept*** a magistrate's findings concerning credibility and not violate due process," this "reaches to the limits of due process." *Louis*, 630 F.2d at 1109 (emphasis added); *see also Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1250 (11th Cir. 2006) (extending rule to civil proceedings and holding that "[d]iscarding the magistrate judge's credibility findings without rehearing the relevant testimony amounted to an impermissible shortcut that rendered the result invalid and an abuse of discretion"); *Blizzard v. Quillen*, 579 F. Supp. 1446, 1449 (D. Del. 1984) (noting, in the context of reviewing a magistrate report and recommendation in prisoner civil rights case, that, "[i]f a district judge resolves a credibility dispute differently than the magistrate, Article III and the due process clause usually require the court to conduct a fresh evidentiary hearing").

## ARGUMENT

By rejecting the magistrate's credibility determinations without first conducing an evidentiary hearing to assess that testimony for itself, this Court has erred as a matter of law. The magistrate judge presiding over the evidentiary hearing had the opportunity to listen to the witnesses, observe their verbal and non-verbal mannerisms, and determine—critically—whether Defendant Gwinn was telling the truth when he flatly testified that he did not use o/c spray on this Plaintiff—period. If the Court had concerns about the credibility findings of the magistrate, the remedy is not simply to flip-flop those decisions, but rather, to convene a new evidentiary hearing so the Court could hear that testimony for itself—so the Court could look Defendant Gwinn and the other witnesses in the eyes when they were testifying, before determining that they perjured themselves on the stand. By neglecting to do so, this Court has deprived Defendant Gwinn of a fair trial, violating his right to due process of law.

As to the pretrial spoliation motion, this Court did not apply the correct standard of review.  As a non-dispositive pretrial motion not specifically excepted under 28 U.S.C. § 636(b)(1)(A), this Court is bound to accept the magistrate's ruling—also based on the credibility of the witnesses—unless clearly erroneous or contrary to law.  Because this Court apparently engaged, instead, in a *de novo* review of the evidence, the Court has made a clear error of law. When the appropriate standard of review is applied, this Court should uphold the magistrate's credibility and legal findings as not clearly erroneous, and the motion for spoliation sanctions should be denied.

For these reasons, and as discussed in more detail below, Defendant Gwinn requests that this Court vacate its opinion and order of November 14, 2020 (ECF No. 79, 80), uphold the magistrate's ruling on the pretrial spoliation motion as not clearly erroneous or contrary to the law, and either: (1) giving appropriate deference to the credibility findings of the magistrate, enter judgment in favor of the Defendant, or (2) convene a subsequent evidentiary hearing so that this Court may assess the demeanor of the witnesses, for itself, before reaching a credibility decision that is contrary to that of the magistrate judge.

I. **THE MAGISTRATE'S DENIAL OF THE MOTION FOR SANCTIONS SHOULD BE UPHELD.**

A. <u>**This Court applied an incorrect standard when considering the Plaintiff's objections to the spoliation ruling.**</u>

The resolution of a non-dispositive motion referred to a magistrate judge may be modified or set aside only if it is "clearly erroneous or contrary to law."  28 U.S.C. § 636(b)(1)(A); *see also* Fed. R. Civ. P. 72(a).  This is the appropriate standard to apply to Magistrate Judge Hoppe's ruling on the motion for spoliation sanctions.  By conducting, instead, a *de novo* review of the evidence and arguments presented, this Court has erred as a matter of law.

Of note, although the Plaintiff was seeking default judgment in his motion for sanctions, this does not convert his Rule 37 motion for sanctions into a "dispositive motion." As one court has explained, "[t]he different treatment of dispositive and non-dispositive motions is best understood by a review of the authority upon which this distinction is based." *Segal v. L.C. Hohne Contrs., Inc.*, 303 F. Supp. 2d 7901, 792 (S.D. W. Va. 2004). Specifically, "[t]he Magistrates Act, codified at 28 U.S.C. § 636, permits a district judge to refer certain matters to a magistrate judge for determination," and section 636(b)(1)(A) "gives magistrate judges the authority to 'hear and determine any pretrial matter pending before the court,' with exception of motions: [1] for injunctive relief, [2] for judgment on the pleadings, [3] for summary judgment, [4] to dismiss or quash an indictment or information made by the defendant, [5] to suppress evidence in a criminal case, [6] to dismiss or to permit maintenance of a class action, [7] to dismiss for failure to state a claim upon which relief can be granted, and [8] to involuntarily dismiss an action." *Id.* at 792-93.

A Rule 37 motion for sanctions—even one that requests default judgment—is not a "dispositive" motion within the meaning of the magistrate referral statute. Rather, a Rule 37 motion simply "ask[s] the court to sanction the defendant in some way for its alleged discovery abuses." *Id.* at 794. "Although the plaintiff may ask the court to impose the most severe of sanctions, it is for the court to decide which sanctions, if any, [are] appropriate. Therefore, a motion for 'default judgment' based on alleged discovery violations is nothing more than an optimistically labeled motion for sanctions." *Id.* "Clearly, a case is not disposed of if a sanction other than default judgment is granted or if the motion for sanctions is denied. [Only] in the rare situation where default judgment is actually imposed as a sanction, the motion for sanctions becomes dispositive of the case, . . . and the Constitution requires that the district court judge

undertake *de novo* review of that determination upon objection." *Id.* "To conclude otherwise would permit the party seeking sanctions to engage in a game of labels that would improperly dictate the standard of review." *Id.*; *see also Alpha Omega Servs. v. Dyncorp Int'l, LLC*, No. 1:13cv00809, 2014 U.S. Dist. LEXIS 50011, at 12-13 (E.D. Va. Feb. 11, 2014) ("Courts in this district have held that the 'determination of sanctions is ordinarily nondispositive.' . . . When a party brings any motion for sanctions, the sanction chosen by the magistrate judge, rather than the sanction sought by the party, governs the determination of whether the matter is nondispositive or dispositive, and whether Rule 72(a) or 72(b) applies.").

For this reason, *denial* of a Rule 37 discovery motion by a magistrate judge is "nondispositive," and that decision should be reviewed "under the deferential 'clearly erroneous or contrary to law' standard." *FEC v. Christian Coalition*, 178 F.R.D. 456, 460 (E.D. Va. 1998).

**B.   When the proper standard of review is applied, the magistrate judge's ruling on the spoliation motion should be upheld.**

"A judicial finding is deemed to be clearly erroneous when it leaves the reviewing court with 'a definite and firm conviction that a mistake has been committed.'" *Tri-Star Airlines, Inc. v. Willis Careen Corp. v. Los Angeles*, 75 F. Supp. 2d 835, 839 (W.D. Tenn. 1999) (quoting *Heights Community Congress v. Hilltop Realty, Inc.*, 774 F.2d 135, 140 (6th Cir. 1985). But "[u]nder the clearly erroneous standard, a court reviewing a magistrate judge's order should not ask whether the finding is the best or only conclusion that can be drawn from the evidence." *Id.* "Further, this standard does not permit the reviewing court to substitute its own conclusion for that of the magistrate judge. Rather, the clearly erroneous standard only requires the reviewing court to determine if there is any evidence to support the magistrate judge's finding and that the finding was reasonable." *Id.*; *see also Int'l Ass'n of Machinists & Aerospace Workers v. Werner-*

*Matsuda*, 390 F. Supp. 2d 479, 486 (D. Md. 2005); *DE Techs., Inc. v. Dell, Inc.*, No. 7:04cv0062, 2007 U.S. Dist. LEXIS 2769, at *3-4 (W.D. Va. Jan. 12, 2007).

Moreover, when a reviewing court is considering an underlying ruling for clear error, that court defers to the credibility findings of the judge who heard and resolved any live testimony on the asserted issue. *See, e.g.*, *United States v. Nichols*, 429 F. App'x 355, 358 (4th Cir. 2011) (reviewing district court's finding of drug weight for clear error, and noting, under that standard, that "[c]redibility determinations [] receive deference unless they are without support in the record"); *United States v. Wheatland*, 57 F. App'x 194, 195 (4th Cir. 2003) (reviewing denial of a suppression motion for clear error, and noting, under that standard, that "[w]itness credibility is not subject to [] review"); *United States v. Okwesa*, No. 1:14cr90, 2014 U.S. Dist. LEXIS 83116, at *4 (E.D. Va. June 18, 2014) ("Findings of fact are reviewed for clear error, and credibility determinations are not susceptible to judicial review but rather are the sole province of the fact finder.").

Here, the magistrate judge found, as a factual matter, that the surveillance video "could not possibly have shown Gwinn putting his arm through the slot and spraying Johns with OC spray during [7:00 a.m. and 8:30 a.m.]." (ECF No. 70, p. 28)  This factual finding was supported by evidence in the record—specifically, Mr. Swiney's affidavit, the written responses to the Plaintiff's multi-level grievances, the testimony of Sergeant Fleming during the evidentiary hearing, and the testimony of Mr. Swiney during the evidentiary hearing—testimony that the magistrate expressly found to have been "credible and consistent." (ECF No. 70, p. 24) Although this Court, conducting a *de novo* review, has opined that the testimony of Mr. Swiney should be discredited because of "bias," and criticizes other aspects of the magistrate's

credibility determinations,[6] the question before this Court is not how it would have weighed or assessed the live testimony of the witnesses.  Rather, upon a clear error review, the question is whether there is *any* evidence in the record that would support the magistrate's determination that Mr. Johns had not sustained his burden of showing that the missing video would have been favorable to his case.  That record evidence plainly exists, in the form of the live testimony, the affidavit, and the written responses to Mr. John's grievances (which documented multiple reviews of the Rapid-Eye footage and unanimously concluded that the claimed event did not occur).[7]  Moreover, the magistrate's decision was based—at least in part—on an express credibility finding that is due substantial deference under the clear error standard of review.

Accordingly, even conceding (solely for purposes of argument) that there was some spoliation of evidence potentially attributable to this Defendant, the magistrate properly denied the Plaintiff's motion for sanctions based on that loss of evidence.  As this Court recognized, "a court may not impose sanctions remedying the spoliation without first finding that the moving party was actually prejudiced by the spoliation."  Mem. Op. (ECF No. 79), at p. 24.  That is, "the moving party must demonstrate a likelihood that the lost evidence would have been favorable to the moving party's case."  *Id.*  Because the magistrate concluded that the Plaintiff failed establish that the evidence would have been favorable to him, and because that determination is amply supported by evidence in the record, the magistrate's decision was not clearly erroneous or without evidence to support it.  Applying the appropriate level of scrutiny, this Court should

---

[6] Defendant will respond more fully to the Court's assessment of the testimony of the witnesses in Part F, *infra* pp. 53-62.  To the extent relevant, those arguments are incorporated by reference into the rationale of this subsection as well.

[7] ECF No. 48-1 (submitted as exhibits to the Defendant's Response in Opposition to the Plaintiff's Motion for Sanctions)

therefore have overruled the Plaintiff's objections to the magistrate's denial of the Plaintiff's

motion for spoliation actions.

Defendant therefore moves this Court under Rule 52(b) to amend its final opinion and

order to incorporate the proper standard of review on this non-dispositive pre-trial motion, and

further moves this Court under Rule 59(e) and Rule 60(b) to vacate its findings on the spoliation

motion and enter judgment upholding the magistrate's denial of the Plaintiff's motion for

sanctions as not clearly erroneous or contrary to the law.

C.   **This Court incorrectly concludes that there was "spoliation" of evidence by VDOC.**

In its findings of fact and conclusions of law, this Court concludes that the Virginia

Department of Corrections[8] engaged in spoliation of evidence, and that this spoliation is

imputable to this non-supervisory, individual-capacity defendant.  Addressing the first aspect of

this question, Defendant submits that the Plaintiff did not carry his burden of proving spoliation

of evidence in the first instance.

Generally speaking, "[s]poliation refers to the destruction or material alteration of

evidence or the failure to preserve property for another's use as evidence in pending or

reasonably foreseeable litigation."  *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir.

2001).  Typically, "[a] party may be sanctioned for spoliation if the party (1) had a duty to

preserve material evidence, and (2) willfully engaged in conduct resulting in the loss or

destruction of that evidence, (3) at a time when the party knew, or should have known, that the

evidence was or could be relevant in litigation."  *Blue Sky Travel & Tours, LLC v. Al Tayyar*,

606 F. App'x 689, 697-98 (4th Cir. 2015) (citing *Turner v. United States*, 736 F.3d 274, 282 (4th

---

[8] Because the Court concluded that Defendant Gwinn, as an individual, did not spoliate evidence, this analysis will focus on the Virginia Department of Corrections, as an entity.  *See* Mem. Op. (ECF No. 70), at p. 10.

Cir. 2013)).  The decision to award spoliation sanctions is vested in the discretion of the trial

court, *Turner*, 736 F.3d at 281, and the burden of proof lies upon the individual requesting the

award of sanctions *id.*, at 282.

Although federal courts previously relied on their inherent authority or underlying state

law when determining whether spoliation sanctions should be awarded, Federal Rule 37(e), as

amended, "authorizes and specifies measures a court may employ if [electronically stored]

information that should have been preserved is lost, and specifies the findings necessary to

justify those measures."  Fed. R. Civ. P. 37, Advisory Committee Notes to 2015 Amendments.

Accordingly, for purposes of electronically stored information, the amended rule "forecloses

reliance on inherent authority or state law to determine when certain measures should be used."

*Id.*

Under Federal Rule 37(e), "[i]f electronically stored information that should have been

preserved in the anticipation or conduct of litigation is lost because a party failed to take

reasonable steps to preserve it," and that information "cannot be restored or replaced through

additional discovery," the court, "upon finding prejudice to another party from loss of the

information, may order measures no greater than necessary to cure the prejudice."  Fed. R. Civ.

P. 37(e)(1).  Additional sanctions, such as default judgment, are warranted "only upon finding

that the party acted with intent to deprive another party of the information's use in the litigation."

Fed. R. Civ. P. 37(e)(2).  However, "[c]are must be taken . . . to ensure that curative measures

under subdivision (e)(1) do not have the effect of measures that are [only] permitted under

subdivision (e)(2)," Fed. R. Civ. P. 37, Advisory Committee Notes to 2015 Amendments—such

as inferring that missing evidence would have been adverse to the party against whom sanctions

are sought.

Rule 37(e), however, "does not apply when information is lost before a duty to preserve arises."  Fed. R. Civ. P. 37, Advisory Committee Notes to 2015 Amendments.  When determining whether "a duty to preserve arose," courts "should consider the extent to which a party was on notice that litigation was likely and that the information would be relevant."  *Id.*  Also, "[t]he fact that a party had an independent obligation to preserve information does not necessarily mean that it had such a duty with respect to the litigation, and the fact that the party failed to observe some other preservation obligation does not itself prove that its efforts to preserve were not reasonable with respect to a particular case."  *Id.*

1.   <u>VDOC did not have a duty to preserve the video evidence</u>.

"A party seeking sanctions based on the spoliation of evidence must establish, *inter alia*, that the alleged spoliator had a duty to preserve material evidence."  *Turner*, 736 F.3d at 281.  "This duty arises 'not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation.'"  *Id.* (quoting *Silvestri*, 271 F.3d at 591).  Generally, however, "it is the filing of a lawsuit that triggers the duty to preserve evidence."  *Id.*

*Turner v. United States*, 736 F.3d 274 (4th Cir. 2013), dealing with an analogous issue, supports a finding that, under the circumstances of this case, there was no pre-litigation duty to preserve.  In *Turner*, the Plaintiff sought to establish that the United States was liable, under the Suits in Admiralty Act (SIAA), for the Coast Guard's alleged breach of duty during a rescue attempt of mother and her adult son following a boating accident.  As part of that litigation, the Plaintiff filed a motion for spoliation sanctions, alleging that the Coast Guard "wrongfully destroyed audio recordings of telephone calls to the Coast Guard by recycling them and recording over them."  *Id.* at 282.  Although the voice recordings had been reviewed "the very

next morning" after the boating accident, the Coast Guard personnel "discovered nothing" on those recordings, and they were therefore recycled in the ordinary course of business. *Id.* Because the Plaintiff had not notified the Coast Guard of potential litigation, and because the Coast Guard had "no reason to believe that voice recordings devoid of a rescue call would be relevant in any event, the Coast Guard had no reason to change its standard routine." *Id.*

A similar rationale applies here. Although aware that some sort of claimed incident had occurred, VDOC personnel reviewed the videos within the same approximate time frame, and yet did not observe any use-of-force incident that would have caused those employees to "change [VDOC's] standard routine" and save that evidence. Although the Plaintiff submitted an informal complaint and a regular grievance, he did not otherwise request that the video be saved or notify the institution that he intended to file a lawsuit—a lawsuit that he waited until the cusp of the statute of limitations to actually submit, long after the video had been recorded over. Under these circumstances, as in *Turner*, there was no pre-litigation duty to preserve the surveillance video, particularly considering that it did not depict a reportable incident between the officer and the inmate. *Cf. Turner*, 736 F.3d at 282 (no pre-litigation duty to preserve where the Coast Guard personnel reviewed audio recordings after becoming aware of an incident, but "discovered nothing" no those recordings, and therefore allowed them to be recorded over in the ordinary course of business).

In the memorandum opinion, however, this Court concludes that VDOC had a duty to preserve the video evidence because VDOC officials should have assumed, upon receipt of the Plaintiff's grievances, that he would ultimately file suit. In support of this conclusion, the Court reasoned, first, that the "Plaintiff specifically told VDOC that the Rapid Eye video supported *his* version of events when he appealed the Level I response to his regular grievance." Mem. Op.

(ECF No. 79), at p. 17.  Yet, a Level I grievance appeal is not a document that is submitted to the facility itself—rather, it is forwarded directly to a regional ombudsman operating outside of that institution.[9]  Because the Plaintiff waited until his grievance *appeal* to specifically reference the RapidEye footage, and because he concededly never submitted an Offender Request form requesting preservation of that footage, the record does not reflect that any individual at Red Onion State Prison—where the video was located—was ever informed that the Plaintiff believed the RapidEye would support his version of events, that he was intending to file suit, or that he was otherwise requesting that the video be saved.

In essence, this Court has concluded that a VDOC facility will have a duty to preserve any surveillance video evidence (regardless of whether it depicts an incident[10] or not) whenever an inmate files a complaint about an alleged incident at its prisons.  In support of this conclusion, the Court opines that "[i]t beggars belief in this day and age there is not enough space within the VDOC to store a few minutes of video for a period of time," and—specific to the circumstances of this case—additionally faults counsel for not having called the "investigator to testify if in fact he did not retain the video, and if not, why not."  Mem. Op. (ECF No. 79), at p. 20.

---

[9] *See* VDOC Operating Procedure 866.1(IV)(C)(2), *available at* https://vadoc.virginia.gov/files/operating-procedures/800/vadoc-op-866-1.pdf

[10] Although the Court suggests that this video, as described by Mr. Swiney, depicted an "incident" or "threatened incident" sufficient trigger VDOC's evidence-preservation policies (specifically, a threat to break a sprinkler head), Defendant notes that RapidEye video does not contain sound, nor does it show what happens inside an offender's cell.  It is reasonable to determine that a video showing an officer briefly pausing at an offender's cell, and either putting his hand on his o/c spray or withdrawing it, but never using it, was so minimal an interaction that it would not trigger this preservation policy.  The video did not show a use of force, did not record what was said between the parties, and did not show what was happening inside the Plaintiff's cell. It depicted, instead, a run-of-the-mill interaction between a corrections officer and an inmate.  Hundreds of similar interactions occur within prisons on a daily basis, and the quick de-escalation here meant the incident was so minimal that it never even made it into the housing unit logbooks.

As to the investigator's absence at trial, counsel notes, first, that a third individual testifying that the surveillance video did not depict a use-of-force situation would have amounted to cumulative evidence, particularly considering that the evidentiary hearing was convened for the purposes of disputing the substantive allegations of the complaint—the spoliation motion had simply been taken under advisement pending arguments, which were to be presented at trial. And regardless, counsel will represent to the Court that, as of the date of the evidentiary hearing, the referenced investigator had retired from employment at ROSP and was not available for trial—which, apart from the cumulative nature of any testimony regarding the video, is why he was not listed on Defendant's Pretrial Disclosures (ECF No. 61).

Turning to the first point, VDOC facilities receive hundreds, if not thousands, of informal complaints and grievances on a yearly basis. For example, the tracking number ROSP-16-INF-00610 on the Plaintiff's informal complaint, submitted in April 2016, represents that—four months into the calendar year—this was the 610th informal complaint processed at that facility. The tracking number ROSP-15-00172 on the Plaintiff's regular grievance, received in May 2016, represents that this was the 172nd regular grievance accepted at intake at ROSP during that calendar year. It is not, then, simply a matter of physical or electronic storage space that is at issue. It is the time and manpower that would be required to go through and find and save a video every time an inmate filed a grievance about something, and then ensure that the video is properly retained for 3-5 years while the facility waits to see if litigation ever materializes. VDOC policies certainly provide for the preservation of surveillance video evidence—if an inmate submits a request form, or specifically references the video in a grievance (as opposed to a grievance appeal), then, by policy, it will be saved. It is not at all unreasonable for VDOC to ask inmates to share the burden of determining when a surveillance video clip should be

downloaded and saved.  It is the inmate, after all, who is in the best position to know whether he intends to sue a VDOC employee over an alleged incident.  All the inmate has to do is ask—and Mr. Johns did not.

Considering the circumstances of this particular case, although *perhaps* VDOC officials could have anticipated potential litigation arising out of the Plaintiff's submission of institutional grievances, that is not the appropriate inquiry.  The question, rather, is whether the reviewing individual "reasonably should have known" that the Plaintiff was intending to file suit, and that the surveillance video would be relevant to that lawsuit.  Here, the Plaintiff has presented nothing apart from his grievances to support some finding of a duty to preserve.  For the reasons expressed above, the submission of those grievances, alone, was insufficient to trigger the duty to preserve.  For this additional reason, the magistrate's decision to deny the Plaintiff's motion for spoliation was not clearly erroneous or contrary to the law.

2.   <u>VDOC did not knowingly breach any duty to preserve evidence</u>.

To find that a party has engaged in the spoliation of evidence, the moving party must also establish that the alleged spoliator engaged in conduct leading to the loss of the evidence.  *Blue Sky Travel & Tours*, 606 F. App'x at 697-98.  As embodied in Rule 37(e), specific to loss of electronically-stored evidence, this inquiry is modified, slightly, to inquire into whether the loss of evidence occurred because a party failed to take reasonable steps to preserve it.  This is a separate question from whether the duty to preserve exists in the first instance, focusing instead upon whether that duty was breached.  Because spoliation does not occur when a loss of evidence is attributable to simple negligence, *Turner*, 736 F.3d at 282, Defendant submits that any breach of duty must be amount to more than mere negligence, but instead constitute a

knowing breach of a duty to preserve—in other words, that the party knew the evidence should be saved, and yet failed to take any action to preserve it.

In the context of this particular case, the "reasonableness" of VDOC's failure to preserve the surveillance video evidence must therefore be assessed from the viewpoint of the employees who viewed that video before it was recorded over in the ordinary course of business. Both Mr. Swiney and Sergeant Fleming testified that they viewed the video, and that the video did not depict an incident between the Plaintiff and Defendant Gwinn—at least not one of sufficient seriousness to require its preservation under VDOC's evidence-retention policies.[11] Nevertheless, Mr. Swiney testified that he informed the institutional investigator that the Plaintiff had claimed that o/c spray had been used on him, but that the video did not show what the Plaintiff was alleging. Considering that the video did not depict a use-of-force situation, this was a reasonable response.

As discussed above, VDOC cannot be expected to search for, retrieve, and save clippings of surveillance video corresponding to every single inmate complaint or grievance that is received, regardless of whether that video actually depicts an incident between an officer and an inmate. By pulling up and watching the video and determining that it did not show anything of note, Mr. Swiney and Sergeant Fleming acted reasonably under all the circumstances. Their failure to request that the video be preserved for was negligent, at best, and did not represent a knowing breach of a duty to save material evidence. The Plaintiff failed to carry his burden of establishing otherwise. Because it is the Plaintiff's burden to show both a duty to preserve, and a corresponding breach of that duty, the Plaintiff's motion for spoliation sanctions was properly denied.

---

[11] *See* n. 10, *supra*.

**D.     Any duty to preserve and breach of duty by other persons within VDOC cannot be imputed to Defendant Gwinn.**

In its memorandum opinion, this Court concluded that "VDOC has a uniquely intertwined relationship with Defendant," considering that "VDOC employs Defendant, it trains Defendant, and through the Attorney General's office, it represents Defendant in this suit," "appears to control all evidence introduced in his favor,"[12] and "any judgment against Defendant—at least with respect to compensatory damages—will be paid by VDOC."  Mem. Op. (ECF No. 79), at pp. 11-12.  The Court then opines that "[a]ny sanction against Defendant will be in many important respects a sanction felt most acutely by VDOC."  Mem. Op. (ECF No. 79), at p. 12.  Applying the Fourth Circuit ruling in *Silvestri*, the Court concluded that there was a "special relationship" between VDOC and this corrections officer, making VDOC's failure to save evidence imputable to this lone defendant, further opining that "refusal to recognize a special relationship would lead to the absurd result that a state-run correctional facility could wrongly destroy any piece of evidence in its control with near-zero risk of consequence in prisoner suits."  Memo Op. (ECF No. 79), at p. 14.[13]

Turning to the first of the Court's considerations—whether VDOC controls the conduct of this litigation and would be responsible for paying an award of damages—this Court has

---

[12] Counsel notes that, generally, information not in the custody or control of a litigant must be sought through the issuance of third-party subpoenas under Rule 45.  In *pro se* prisoner cases, counsel typically obtains, in response to prisoner discovery requests, information and documents within the custody or control of the prison itself.  That counsel is able to procure and produce third-party materials, obviating the need for a Rule 45 subpoena, does not itself transform the relationship between the Defendant and VDOC into a "special" one for purposes of assessing a motion for discovery sanctions.

[13] This rationale—in essence, that prisons will allow the unfettered destruction of evidence in the absence of a court-created vicarious spoliation rule—overlooks the long-standing premise that a "presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *United States v. Chem. Found'n, Inc.*, 272 U.S. 1, 14-15 (1926).  The handful of cases from

misconstrued the arguments of counsel during the evidentiary hearing.  First, the Virginia

Department of Corrections is not "defending" this case.  The Office of the Attorney General is.

Under Virginia Code § 2.25-7(B)(4), the Office of the Attorney General possesses the discretion

to represent "employees" of the Virginia Department of Corrections "who are made defendant in

any civil action for damages" that arises out of their employment.  The Virginia Department of

Corrections is not involved in any part of this discretionary decision—initial questions as to

whether an employee should be defended through the Office of the Attorney General are made

by that office, through consultation, where needed, with the Division of Risk Management

(within the Department of the Treasury).

Second, the Virginia Department of Corrections does not cover all or part of *any* damages

assessed against an employee being sued for alleged conduct arising out of his employment,

punitive or otherwise.  The Commonwealth of Virginia, through the Division of Risk

Management, has the option of indemnifying a state employee who is found liable in a civil suit

for damages.  But, as explained during the evidentiary hearing, it will not necessarily do so.

Indeed, as counsel represented during the hearing, an express provision of the Risk Management

Plain excludes from reimbursement "[a]ny claim arising from malicious, willful, wanton, or

criminal acts," particularly "where a court or other trier of fact has determined that the covered

party has engaged in any of the aforementioned acts."  *Fletcher v. Commonwealth*, 81 Va. Cir.

107, 225 (2010) (discussing the Risk Management system in the context of a suit brought by a

former corrections employee who had been excluded from coverage, determining that the officer

---

Virginia federal courts involving an alleged failure to save video evidence, most of which pre-
date the modification of VDOC's video preservation policies in 2015, do not support a
conclusion that VDOC is failing to save evidence on any widespread scale, much less one that
would justify imposition of the rule endorsed by this Court.

was entitled to state-provided representation in the first instance, but that the state was not

necessarily obliged to also pay an award of damages entered against him).  Regardless, even if

indemnification were granted, it is not the Virginia Department of Corrections that would pay

that money—an award of damages for which indemnification is allowed is paid directly by the

Department of the Treasury.  As such, it is not VDOC who would feel the sting of any monetary

award—it is the taxpayers of the Commonwealth of Virginia.  Although the Court opines that

VDOC would be appropriately "punished" through an award of spoliation sanctions, that

decision would not actually "punish" VDOC at all.  The impact would be felt elsewhere.

   Considering that there is no indemnification relationship[14] that would potentially give

rise to a "special relationship"—as between an insured and his insurance company—all that is

left is the employer-employee relationship between the Defendant and VDOC.  The Fourth

Circuit, although allowing an employer to be found responsible for an employee's failure to save

evidence, has never allowed the imputation to go in the opposite direction—exposing an

employee's pockets to liability for something that his employer has done (or, more on point, has

failed to do).

   The Fourth Circuit has, however, recently upheld a district court's refusal to impute

VDOC's failure to preserve a surveillance video to a corrections officer.  *See Boone v. Everett*,

751 F. App'x 400 (4th Cir. 2019) (per curiam).  In *Boone*, the Plaintiff filed a motion for

spoliation sanctions, based on VDOC's failure to save surveillance video depicting a physical

altercation between the Plaintiff, an inmate, and the Defendant, a corrections officer.  *Boone v.*

---

[14] Because it is the Plaintiff who is seeking an award of spoliation sanctions, even if a "special relationship" between a litigant and a third party could serve as a basis for an award of sanctions under Rule 37(e), it would be the Plaintiff's burden of proving the existence of that "special relationship."  Apart from noting that the Plaintiff and Mr. Swiney are both employees of VDOC, the Plaintiff has produced no other evidence of a "special relationship" in this context.

*Everett*, No. 1:14cv1619 (E.D. Va.) (ECF No. 133).  Following briefing and oral arguments,

which included the Plaintiff's argument that VDOC's failure to save the video was imputable to

the Defendant corrections officer, the magistrate judge denied the motion.  *Boone v. Everett*, No.

1:14cv1619 (E.D. Va.) (ECF No. 149).  The Plaintiff objected to the magistrate's ruling,

contending, *inter alia*, that "in light of VDOC's involvement in this case, the law allows

VDOC's preservation duty (and corresponding spoliation) to be imputed to [the Defendant

corrections officer]."  *Boone v. Everett*, No. 1:14cv1619 (E.D. Va.) (ECF No. 165, at p. 2).  The

district court judge, however, found that argument unpersuasive, determining that the

magistrate's order was not clearly erroneous or contrary to the law.  *Boone v. Everett*, No.

1:14cv1619 (E.D. Va.) (ECF No. 188).

On appeal, the Fourth Circuit affirmed the denial of spoliation sanctions.  The Fourth

Circuit noted, first, that "[i]t is undisputed that the video surveillance systems at the correctional

institution captured the relevant altercation between [the inmate and the officer], but, because no

one in the Virginia Department of Corrections saved the video, the video surveillance system

recorded over the footage before discovery in this case." *Boone v. Everett*, 751 F. App'x 400,

402 (4th Cir. 2019).  The defendant officer actually "viewed the video once," but "did not have

the ability to access the video himself, and he never asked any of his supervisors to preserve the

video."  *Id.*  The inmate "never saw the video," but "demanded to see it in the institutional

grievances he filed," and he "asserted that the video would corroborate his claims."  *Id.*  As in

this case, although "[t]here [was] no evidence in the record that [the defendant officer] or anyone

acting on his behalf took any active steps to erase the video," neither was there evidence that

anyone took affirmative steps to save it.  *Id.*

Based on those circumstances, which are on all fours with the present case, the Fourth Circuit agreed that the Plaintiff "has not established that [the defendant officer] committed an act or omission that led to spoliation of the video evidence and was either willful or done with the intent to deprive [the Plaintiff] of the use of the evidence," and therefore affirmed the denial of spoliation sanctions. *Id.* Despite the arguments raised in the trial court, then, the *Boone* court plainly focused on the culpability of the individual officer—not that of an executive-branch agency as a whole. That decision is controlling here.

The *Boone* decision also corresponds to the advisory committee notes accompanying Federal Rule 37(e), which note that the Rule does not impose a duty to preserve where the lost information "may not be in the party's control." Fed. R. Civ. P. 37, Advisory Committee Notes to 2015 Amendments. This Court's decision is therefore at odds with those Advisory Committee notes, which do not condone imposition of sanctions where a third party to the litigation fails to preserve electronically stored information, as well as the plain language of Federal Rule 37(e), which allows for sanctions only when "***a party***" has failed to preserve relevant ESI.[15]

Citing out-of-circuit precedent and unpublished district court cases that precede the Fourth Circuit's holding in *Boone*, this Court has concluded otherwise, reasoning that a third party's failure to preserve relevant ESI may be imputed to a litigant where those parties are in a "special relationship." The Eighth Circuit decision cited in support of this "rule" arose from a federal court, sitting in diversity and applying Arkansas law, that quoted Kansas law to decide

---

[15] Prior to the enactment of amended Rule 37(e), federal courts considering spoliation motions often considered the relevant evidentiary law of the forum state. Although the Advisory Committee notes for ESI indicate that state law no longer serves as a controlling source of authority, Defendant notes that the Virginia Supreme Court has held that destruction of evidence by a party's own expert witness—certainly someone in a "special relationship" with that litigant—could not serve as a basis for a spoliation finding. *See Gentry v. Toyota Motor Corp.*, 252 Va. 30, 31-32 (1996).

whether Arkansas would recognize an independent state-law tort for spoliation of evidence. *Wilson v. Beloit Corp.*, 921 F.2d 765 (8th Cir. 1990).  That decision did not address whether spoliation sanctions could be imposed, under the Federal Rules, when a third party negligently destroys evidence, nor has the dicta quoted from the Kansas Supreme Court been discussed or adopted by the Fourth Circuit in any context, much less this one.

Defendant recognizes that, in *Pettit v. Smith*, 45 F. Supp. 3d 1099 (D. Ariz. 2014), decided prior to the amendments to Federal Rule 37(e), a district court in Arizona elected to impute an agency's failure to save evidence to individual state employees.  *Pettit*, though, has not been universally accepted outside of its jurisdiction; to the contrary, its rationale has been squarely rejected by other federal district courts.  *See, e.g.*, *Peters v. Cox*, 341 F. Supp. 3d 1192 (D. Nev. 2018) ("The Court respectfully disagrees with the *Pettit* court's attempt to distinguish cases where a court imputes a state's actions to a defendant only for the purposes of spoliation sanctions, as opposed to direct liability.  The Supreme Court has been clear that the Eleventh Amendment is directed to protecting the dignity of a statue's sovereignty, not only its pocketbook.").

Nor does *Silvestri v. GMC*, 271 F.3d 583 (4th Cir. 2001), compel the result this Court has reached.  In *Silvestri*, arising out of an automobile accident, a plaintiff filed suit against the manufacturer of that vehicle, alleging that the airbag was defective.  After the accident, and while the Plaintiff was still in the hospital, his parents retained an attorney.  That attorney immediately retained two accident reconstruction experts, who were allowed to freely inspect the vehicle, which belonged to a third party.  One of those experts suggested to the attorney that the vehicle be maintained in its post-accident condition and the manufacturer informed of the potential litigation so the manufacturer would be able to inspect it as well.  *Id.* at 586.

Nonetheless, neither the Plaintiff nor his attorney notified the manufacturer of the existence of the vehicle or the potential for litigation, and a few months later, the vehicle was repaired. *Id.* at 587. The manufacturer later filed a motion for spoliation sanctions, requesting dismissal of the Plaintiff's action.

The district court, sitting in diversity and applying New York law, concluded that the Plaintiff had breached his duty to either preserve the vehicle or notify the manufacturer that it was available and was the subject of potential litigation. Reasoning that the Plaintiff had access to the evidence, and the Plaintiff was aware of potential litigation and had been informed that he needed to make the manufacturer aware of the vehicle so they could perform an independent assessment, the Fourth Circuit concluded that the Plaintiff, his attorneys, and his experts—collectively—failed to adequately discharge the Plaintiff's duty to prevent spoliation of evidence. *Id.* at 592.

Although *Silvestri* therefore concerned evidence that was not physically in the possession of a party to the litigation, it was undisputed that the evidence was accessible and within the Plaintiff's control, at least for a period of time. *Silvestri* did not, then, conclude that the third party had a duty to preserve evidence, and that third party's failure to preserve could be imputed back to a litigant for purposes of assessing sanctions. Rather, *Silvestri* focused on the litigant's ***own*** failure to preserve evidence to which he had access, and his ***own*** corresponding duty to preserve and breach of duty. *Id.* at 593 ("We agree with the district court that [the Plaintiff] failed to preserve material evidence in anticipation of litigation or to notify [the defendant manufacturer] of the availability of this evidence, thus breaching ***his*** duty not to spoliate evidence." (emphasis added)).

*Silvestri* is therefore distinguishable in at least two respects.  First, there was no evidence that Defendant Gwinn was aware of the pendency of this litigation at any time prior to suit being filed.  Indeed, in his motion for sanctions, the Plaintiff affirmatively pled that Defendant Gwinn was not aware of the potential litigation until May 2018, long after the surveillance video was written over in the ordinary course of business.  There is no evidence before the Court, therefore, that Defendant Gwinn, himself, failed to preserve material evidence—accessible to him even though not in his physical possession—in anticipation of litigation.  And *Silvestri* does not stand for the proposition that a third party's failure to preserve evidence should be imputed to a party who was not aware of the litigation in time to ask for relevant evidence to saved.  Second, and relatedly, Defendant Gwinn never had access to the video evidence in the same manner as the Plaintiff in *Silvestri*—rather, it is undisputed that he did not have custody, control, or even access to that surveillance video.  *Silvestri*, then, cannot bear up to the weight that this Court has placed upon it—superimposing a third party's independent duty to preserve on a litigant who did not have knowledge of the pending litigation and, therefore, did not have a corresponding duty of his own.

Turning, then, to whether there is an appropriate standard allowing for the "vicarious" imposition of spoliation sanctions, as one district court has explained, when deciding whether a litigant bears potential culpability for a third party's failure to save evidence, the appropriate inquiry is therefore not whether there is a "special relationship" between the parties, but rather, whether the "destroying party is the 'agent' of that party."  *Gemsa Enters., LLC v. Specialty Foods of Ala., Inc.*, No. CV13-00729, 2015 U.S. Dist. LEXIS 189302, at *27 (C.D. Cal. Feb. 10, 2015).  For this reason, "[a]n employer may be responsible for the spoliation of its employee," *id.*, although the reverse is not necessarily true:  it is one thing to find a principal liable for the

48

misconduct of its agent; it is another thing entirely to find an agent liable for the misconduct of its principal (or, more on point, the misconduct of a different agent, imputed up to the principal, and then imputed down to a new agent, himself innocent of wrongdoing).  *See id.*; *see also E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 803 F. Supp. 2d 469 (E.D. Va. 2011) (imputing spoliation by defendants' employees to their employer, a party to the litigation); *Am. Builders & Contrs. Supply Co. v. Roofers Mart, Inc.*, No. 1:11cv19, 2012 U.S. Dist. LEXIS 101842, at *18 (E.D. Mo. July 20, 2012) ("The Court agrees that general agency principles apply in determining whether to impose sanctions against a party for spoliation by its employees."); *accord Edifecs, Inc. v. Welltok, Inc.*, No. C18-1086, 2019 U.S. Dist. LEXIS 194858, at *9 (W.D. Wash. Nov. 8, 2019) ("The current trend among district courts appears to be to impute liability for an agent's spoliation to the principal 'based on traditional notions of agency law, in which a defendant principal exercises control and authority over its third-party agent who possesses the spoliated evidence." (quotations omitted)); *Vohra v. City of Placentia*, No. 11-1267, 2017 U.S. Dist. LEXIS 223883, at *8 (C.D. Cal. Dec. 29, 2017) ("It would not be appropriate, however, to impute the City's failure to preserve the recording to [the defendant police officer] because, among other things, [the officer] had no control over the recording and the City is not [the officer's] agent.").

For this reason, *Pettit* aside, the overwhelming majority of district courts to have considered this issue have concluded that corrections officers should not be subjected to spoliation sanctions for an agency's failure to retain surveillance video that was never within that officer's custody or control.  *See, e.g.*, *Bush v. Bowling*, No. 19-cv-00098, 2020 U.S. Dist. LEXIS 165577, at *21-23 (N.D. Okla. Sept. 10, 2020) ("[I]t would be inappropriate to impute the County's failure to preserve the video to the Individual Detention Defendants."); *Thomas v.*

*Butkiewicus*, No. 3:13cv747, 2016 U.S. Dist. LEXIS 57163, at \*40-41 (D. Conn. Apr. 29, 2016)

(in the context of failure to preserve prison surveillance video, imposing a duty to preserve only

upon the two named defendants who "had control of, and the obligation to preserve, any of the

surveillance footage related to the incidents at issue in this lawsuit," and, as to the other

corrections officers, concluding that because "neither had control over any of the surveillance

video that was not preserved, . . . neither . . . had an obligation to preserve that footage and [] it

would not be appropriate to direct sanctions against them").  Particularly considering the

Eleventh Amendment concerns raised when a federal court attempts to levy sanctions against an

individual state employee for the express and stated purpose of punishing an executive-branch

state agency, *see* Part E, *infra*, at pp. 51-52, these later cases state the more appropriate rule, and

one that dovetails with Fourth Circuit precedent, including the recent ruling in *Boone*.  *Cf. Adkins*

*v. Wolever*, 692 F.3d 499, 506 (6th Cir. 2012) (affirming denial of spoliation sanctions against

defendant corrections officer with no control over the surveillance video that was not saved,

reasoning, in part, that "to hold that all defendants in situations like [the officer's] must take

affirmative steps to ensure that their employing prison continues to maintain evidentiary records

for every incident . . . would impose an added burden on prison employees" which would

"unnecessarily interrupt a prison administrators' judgment as to how to operate their prisons and

force prison employees to constantly second-guess their employer's ability to maintain potential

evidence for possible litigation," a "burden" the court was not "willing to impose"); *Latimer v.*

*Smith*, No. 16-4004, 2018 U.S. Dist. LEXIS 141792, at \*19-20 (D. Minn. July 20, 2018)

(denying motion for spoliation sanctions based on failure to save video where the defendant

corrections officers "do not have access to video . . . and have no ability to view, edit, actively

save, tamper with, or destroy and video in the course of their work," so "[e]ven if there were

evidence of actual spoliation by someone, . . . entry of judgment as a spoliation sanction against these Defendants would punish them for acts they did not commit").

Because it is undisputed that Defendant Gwinn never had custody or control over the surveillance video, it would be improper to take the actions of other agents—Mr. Swiney, Sergeant Fleming, or the institutional investigator—impute their alleged wrongdoing to the principal (VDOC), and then impute VDOC's vicarious "wrongdoing" back down the chain of command to this individual employee.  Although counsel recognizes the Court's concern that VDOC may not be held "responsible" for some of its employees' failure to retain evidence, the appropriate response is not to judicially craft a rule forcing an entirely different employee to bear that burden.  If the state legislature believes that evidence retention within the prisons is an issue that needs to be addressed, the legislature would be free to waive the sovereign immunity of the Commonwealth and establish a state-law cause of action for failure to retain evidence.

For these reasons, this Court erred when it determined that VDOC's duty to retain evidence and any corresponding breach of that duty should be imputed to this lone, individual-capacity defendant.  Because Defendant Gwinn bears no culpability for the actions of his supervisors and employers, an award of spoliation sanctions is inappropriate.

### E.      Imposing discovery sanctions for the stated purpose of punishing an executive-branch state agency violates the Eleventh Amendment.

Imposing spoliation sanctions against Defendant Gwinn for the Court's stated purpose here—to impose "a sanction felt most acutely by VDOC"—violates VDOC's Eleventh Amendment immunity.  Mem. Op. (ECF No. 79), at p. 12.  As the Ninth Circuit, sitting *en banc*, has explained, federal courts should not extend vicarious liability principles "on the theory that the state will wind up paying any damage award," even if the hope is to "give the state an incentive to improve."  *Peralta v. Dillard*, 744 F.3d 1076, 1084 (9th Cir. 2014) (en banc).

Without question, "the state is protected from monetary damages by the Eleventh Amendment." *Id.* And courts "may not circumvent this protection by imputing the state's wrongdoing to an employee who himself has committed no wrong," in an attempted "end run around the Eleventh Amendment" that would "subject[] the state to precisely the kind of economic pressure against which the amendment protects it." *Id.*; *accord Peters v. Cox*, 341 F. Supp. 3d 1192, 1194-95 (D. Nev. 2018).

VDOC, as an executive-branch state agency, is immune from suit for damages under 42 U.S.C. § 1983. Although "Congress could abrogate this immunity, [] it has not done so." *Peralta*, 744 F.3d at 1084. This Court's decision to give dispositive weight to what it perceives as wrongdoing on the part of VDOC, and to then impute that wrongdoing to an individual employee because VDOC, as the alleged party in error, will supposedly have to pay the damages anyways, "bring[s] about by indirection what Congress has chosen not to do expressly." *Id.* As at least one court has recognized, "[t]he Supreme Court has been clear that the Eleventh Amendment is directed to protecting the dignity of a state's sovereignty, not only its pocketbook." *Peters*, 341 F. Supp. 3d at 1195. For this reason, "[i]mputing wrongful conduct by the State . . . to [the defendant employee] in a case where the State is protected by the Eleventh Amendment would therefore violate the Amendment regardless of whether the Court's order is directed to sanctions or direct liability." *Id.*

Because this Court has imposed spoliation sanctions for the stated purpose of "punishing" VDOC for its failure to save evidence—not Defendant Gwinn's own failure to save evidence—the Court has impermissibly intruded upon VDOC's Eleventh Amendment immunity to suit under 42 U.S.C. § 1983. For this additional reason, imposing "vicarious" liability in the context of spoliation sanctions is inappropriate.

**F.     The Plaintiff failed to carry his burden of establishing that the missing evidence was prejudicial to him.**

As discussed above, under the appropriate standard of review, the magistrate's factual determination that the Plaintiff had not established that he was prejudiced by the missing evidence should be upheld as not clearly erroneous or contrary to law.  Under any standard, however, the Plaintiff has not met his burden of proof.

Generally, "[t]he prejudice inquiry looks to whether the [spoiling party's] actions impaired [the non-spoiling party's] ability to go to trial or threatened to interfere with the rightful decision of the case."  *Leon*, 464 F.3d at 959.  A party therefore suffers prejudice if the spoliation substantially denies the party the ability to support or defend its claim.

Although acknowledging that "the magistrate judge determined, based on the testimony of Fleming and Swiney, that the Rapid Eye footage 'could not possibly have shown Gwinn putting his arm through the slot and spraying Johns with OC spray during that timeframe," this Court opines that "the weight of the evidence produced at trial tells a different story."  Mem. Op. (ECF No. 79), at p. 24.

First, the Court notes that the Plaintiff's medical record shows that a nurse allowed him to take a shower later in the morning on the claimed incident, after he complained about o/c spray having been utilized.  Although the Court is skeptical of the argument that "Nurse Mullins was merely relaying Plaintiff's subjective complaint," the "(c)" written on that document prior to the entry "OC spray utilized" would appear to be shorthand for "complaint"—indicating that the Nurse was documenting the complaint made, and then the action taken.  The Court then apparently draws an adverse inference against the Defendant, based on the fact that the Nurse did not appear to testify at trial.  In support of this rationale, the Court cites to *Vodusek v. Baliner Marine Corp.*, a case that was setting out the standard that may be applied when determining

whether to issue an adverse-inference jury instruction *based on the spoliation of evidence*. *Vodusek v. Baliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995).  The Court's decision to apply an adverse inference here, without first inquiring into whether the absent witness was unavailable for trial, runs directly counter to the accepted premise—often condensed into a standard jury instruction—that the law does not require any party to call as witnesses all persons who may have had some knowledge of the matters in issue at this trial.  Indeed, if an adverse inference is to be drawn against anyone based on the Nurse's absence from trial, it would make more sense to apply that inference against the Plaintiff, the party with the burden of proof, who had equal opportunity to request the Nurse's presence to appear and testify at trial, and yet did not do so.  That the Plaintiff did not seek to have the Nurse testify on his behalf is certainly equally, if not more, damning than her absence as to the Defendant.

Second, the Court concludes that the documentation in the Plaintiff's medical file reflecting that, twice on the morning of the alleged incident, confirmation was sought "from medical staff that Plaintiff would not have an adverse reaction to OC spray," "supports the conclusion that more than one person seriously considered or anticipated the possibility of spraying Plaintiff with OC spray that morning."  Mem. Op. (ECF No. 79, at pp. 25-26).  Yet, the earlier entry, as explained by Sergeant Fleming, was predicated on the fact that the Plaintiff had informed him that he was not willing to move to his new assigned housing unit, following his reclassification to security level "S".  The second entry was made just before the Plaintiff was brought out of his cell, and well after the incident the Plaintiff claimed to have occurred with Defendant Gwinn.  Although it was not documented who made the second request, it is clear that it was not Defendant Gwinn, who unquestionably did not have the authority to request medical clearance for the use of o/c spray.  That the supervisors involved in moving the Plaintiff from

one housing unit to another though they might have problems extracting or transporting him from his cell does not support the Plaintiff's story—that Defendant Gwinn suddenly used o/c spray on him without any form of provocation other than perhaps him masturbating towards a nurse (according to his witness) or "just standing there" (according to him).  The entries in the medical record, corresponding to a supervisor checking to make sure the use of o/c spray was not contraindicated as to this inmate—are therefore equivocal, and do not tend to make more likely the Plaintiff's version of events.

The court next opines that the Plaintiff and Mr. Watson "testified consistently" that Defendant Gwinn "passed Plaintiff's cell as he accompanied Nurse Adams and Nurse Surrat through the D-3 unit," that Defendant Gwinn "stopped at Plaintiff's cell," and that Defendant Gwinn then "opened Plaintiff's tray slot and sprayed him with o/c spray."  Mem. Op. (ECF No. 79, at p. 26)  But this was not actually their testimony.  Mr. Watson first testified that Defendant Gwinn was accompanying Nurse Surratt through the housing unit, they passed the Plaintiff's cell, and Nurse Surratt then "whispered" to Defendant Gwinn that "Inmate Johns was masturbating in his cell while she was signing his chart," at which point Defendant Gwinn went "back" to the Plaintiff's cell, opened his tray slot, and sprayed him.  There was no mention of Nurse Adams in this recounting of events.  (Tr. pp. 8-10.)  Following some prompting by the Plaintiff, Mr. Watson then testified that it was actually Nurse Adams who was walking with Defendant Gwinn, and that Nurse Surratt was back at the Plaintiff's cell when Defendant Gwinn went back over and sprayed the Plaintiff.  This version of events did not reference Nurse Surrat "whispering" to Defendant Gwinn that the Plaintiff was masturbating at his cell.  (Tr. at 14.)  And then Mr. Watson presented a third version on cross-examination, testifying that Nurse

Adams, Nurse Surratt, and Defendant Gwinn were all three at his cell, when Defendant Gwinn

went back over to the Plaintiff's cell to spray him with the o/c spray.  (Tr. at 17).

By contrast, the Plaintiff testified that that Nurse Adams and Defendant Gwinn passed his

cell, where he was "just standing," and that he and Defendant Gwinn began to argue.  (Tr. at 22.)

Mr. Watson did not mention any argument.  The Plaintiff said that Nurse Adams and Defendant

Gwinn were by Watson's cell, but Nurse Suratt was "still a little ways behind," (Tr. at 22-23),

when Defendant Gwinn then came back to the Plaintiff's cell and sprayed him with o/c spray for

a prolonged period of time  (Tr. at 23).  Although similar to one of Mr. Watson's three versions

of events, the testimony of the two inmates is hardly "consistent."

The Court also opines that the two inmates "testified consistently with the logbooks

Defendant introduced at trial," which the Court notes "were not provided to Plaintiff until the

outset of trial."  Mem. Op. (ECF No. 79), at p. 26.[16]  The only "consistency" between the

logbooks and the testimony of the Plaintiff and his witness pertains to the approximate timing of

pill pass in the housing unit that morning.  Considering that pill pass occurs during the same time

period every single day, it is hardly surprising that the two inmates were able to specify when it

occurred.  The Court does also not reconcile the discrepancy between the inmates' testimony—

that the Plaintiff was shouting and requesting help over the intercom for a prolonged period of

time—with the testimony of the control booth officer and the gun post officer that they would

have heard the Plaintiff if he were clamoring for medical attention for 45 minutes, or if an inmate

repeatedly used the intercom to ask for assistance, and that they would have documented any

---

[16] To the extent this statement attempts to fault counsel for not providing those documents during
discovery, counsel notes that they were not requested in either of the Plaintiff's requests for
production of documents.  *See* Def's Response to Plf's First Request for Production of
Documents (ECF No. 30-2); Def's Response to Plf's Second Request for Production of
Documents (ECF No. 49-1).

indication that o/c spray had been used on an inmate.  *See* Fed. R. Evid. 803(7) (absence of a record may be admitted to prove that the matter did not occur or exist).

Both inmates testified that Nurse Adams—the same individual who noted in the Plaintiff's medical record that a supervisor was seeking clearance to use o/c spray—was present in the housing unit, and refused to acknowledge the Plaintiff's complaints. Tr. p. 14.  Neither explains how Nurse Adams could have been in the infirmary, answering phone calls and documenting requests in an inmate's physical medical file, and also in the housing unit, ignoring the Plaintiff, at the same time.  *Compare* Plf's Ex. 2 (documenting that security was requesting approval for use of o/c spray at 7:25 a.m.), *with* Def's Ex. 2 (noting that the nurses had entered the housing unit for pill pass at 7:10 a.m. and left at 7:35 a.m).

The Court further opines, without having actually observed the live evidentiary hearing, that "the testimony of several defense witnesses lacked credibility on the stand."  Mem. Op. (ECF No. 76), at p. 26.  The Court first states that Defendant Gwinn testified "that he likely passed by Plaintiff's cell several times that morning," but Mr. Swiney "testified that he only saw one instance on the video where Defendant passed in front of Plaintiff's cell."  This is a completely inaccurate characterization of Mr. Swiney's testimony.  Mr. Swiney testified that, when reviewing the surveillance video immediately after the Plaintiff complained to him, he saw "one moment in the video that you can see Officer Gwinn stop at his cell, which appeared that he may have removed his OC from the holster and then replaced it immediately, and then continue his round."  (Tr. at 123-24).  At **no time** during Mr. Swiney's testimony did he state that this was the only time Defendant Gwinn was near the Plaintiff's cell, stopped by the Plaintiff's cell, or was otherwise on the floor of the housing unit—just that this was the only time he saw some sort of interaction between the two involving the use or potential use of o/c spray.

Similarly, although Mr. Swiney testified that he did not know what other officers might have approached the Plaintiff's cell that morning (Tr. at 133), this does not "conflict" with the evidence that Sergeant Fleming also came by the Plaintiff's cell.  It just means that, more than three years after-the-fact, Mr. Swiney could not remember who else might have been depicted on the video stopping by the Plaintiff's cell—hardly surprising, since he was looking into an alleged incident involving Defendant Gwinn, not Sergeant Fleming.  Nor does Mr. Swiney's testimony that the Defendant was standing in front of the Plaintiff's cell, alone, "conflict with Defendant's own testimony that this encounter took place while escorting the two Red Onion nurses by Plaintiff's cell."  Mem. Op. (ECF No. 79), at p. 27.  This, again, mischaracterizes the testimony presented.  Defendant Gwinn testified that he took the nurses around during pill pass (Tr. at 72), and, on cross-examination, he said that the incident involving the Plaintiff happened during that approximate time period (Tr. at 73).  Defendant Gwinn, however, never testified that the nurses were physically present at the Plaintiff's cell when he instructed the Plaintiff to get down off of his sink.  (Tr. at 59-60)

The Court next faults Mr. Swiney's testimony about the contents of the video he had watched three years earlier as "remarkably vague," because he "could not recall what time he saw Defendant approach Plaintiff's cell and remove his OC spray," nor could be "recall the timeframe he viewed on the security footage."  Mem. Op. (ECF No. 79), at p. 27.  To be sure, although Mr. Swiney testified that he could not recall "the specific [window] of time" that reviewed the Rapid Eye video, he clarified that it "was most likely from the start of that shift that morning until the time that [he] spoke with Johns" in the vestibule of the housing unit.  (Tr. at 123).  Nor did Mr. Swiney testify that he "saw Defendant approach Plaintiff's cell"—his testimony, rather, was that "[t]here was one moment in the video that you can see Officer Gwinn

stop at his cell, which appeared that he may have removed his OC from the holster and then replaced it immediately, and then continue his round." (Tr. at 123-24). Mr. Swiney was certain that the tray slot on the cell door had not been accessed. (Tr. at 124).

Although the Court opines that Mr. Swiney may have watched an entirely different interaction on the surveillance video, the Court does not reconcile the fact that Mr. Swiney's testimony about the video is—as the magistrate noted—consistent with that of Sergeant Fleming, who reviewed the surveillance video in response to the Plaintiff's informal complaint. Sergeant Fleming testified that he also viewed the Rapid Eye video corresponding to the period of time from 7:00 a.m. until 8:30 a.m., to investigate the Plaintiff's complaint that Defendant Gwinn had used o/c spray against him, and that the surveillance video did not show Defendant Gwinn accessing the tray box or the tray slot on the Plaintiff's door or using o/c spray against him. (Tr. at 90). In its analysis of Mr. Swiney's alleged "bias," the Court entirely fails to mention—much less account for—the testimony of this separate witness.

Finally, attacking the Defendant's testimony, the Court states that "Defendant testified that he did not believe he ever removed his OC spray during any interaction with Plaintiff that day, but he walked this back after leading questions by the Assistant Attorney General." Mem. Op. (ECF No. 79), at p. 28. This again mischaracterizes the testimony given. When first asked whether he had "remove[d] his OC spray from its holster," Defendant Gwinn expressly stated that he could not "remember if [he] did or [he] didn't." (Tr. p. 61). When asked again if he had pulled out his o/c spray, Defendant Gwinn stated that he did not "believe [he] did," and again on cross stated that he did not "recall pulling it," (Tr. at 75), but then on redirect specifically clarified that he could not "remember if [he] did or [he] didn't." (Tr. at 76). Defendant Gwinn therefore testified consistently that he could not recall specifically whether he had pulled out his

o/c spray, or simply touched it in its holster.  But regardless, Defendant Gwinn was certain that he "[d]id not spray it at all."  (Tr. at 62).  Also, although the Court insinuates that perhaps Defendant Gwinn testified erroneously as to whether he had opened the tray slot on the Plaintiff's door during the referenced encounter, Defendant Gwinn was adamant that he did not open the tray box on the cell door "at that particular time whenever I told [the Plaintiff] to get down off the sink."  (Tr. at 62)[17]

Next, the Court concludes that the Plaintiff's testimony could be reconciled with the Defendant's testimony regarding the "implausibility of reaching through a tray slot" while simultaneously holding a cannister of o/c spray, opining that the "Court finds little implausible about a correctional officer spraying an inmate with OC spray through the tray slot on an inmate's cell door," Mem. Op. (ECF No. 79), at pp. 28-29, calling this a "curious contention" to make "given the amount of litigation arising from Red Onion in which corrections officers admitted to engaging in this practice."  *Id.* at p. 29 n. 13.  Again, the Court entirely misapprehends the problem with the Plaintiff's testimony.  The defense witnesses did not testify that spraying o/c spray through a tray slot, in and of itself, was uncommon or foolish.  The testimony was that opening the feeding box—an apparatus protruding from this particular cell door, but not all the cell doors at ROSP—then sliding open the separate tray slot on the door, and then physically putting your arm through the 18-inch feeding box, then through the tray slot, then all the way into the cell, and then leaving your arm dangling inside the cell within physical reach

---

[17] In this context, too, the Court faults Defendant—not Plaintiff—for not having called Nurses Adams and Surratt to testify about whether they were in the housing unit on that day, and if so, what they observed.  The Court does not acknowledge, in this context, the testimony of the multiple other individuals who corroborated the Defendant's testimony that there was no incident in the housing unit that date—specifically, the control booth officer, the gun post officer, and the other assigned floor officer.

of an high-security level inmate while repeatedly pushing the button on a can of o/c spray, would unnecessarily expose the officer to risk of harm.  The defense witnesses further testified that this action—unlocking and opening the feeding box, and then unlocking and opening the separate tray slot—is an action that could not be performed with one hand, and, thus, Defendant Gwinn could not have—as the Plaintiff testified—pulled out his o/c spray, and then, holding the o/c spray in one hand, opened the box and the tray slot, unassisted, with the other hand.  And although the Court also surmises that "Defendant would [not] have necessarily exposed himself to such risk of injury by sticking his arm through the tray slot" because he "could have done so after seeing that Plaintiff was located at a safe distance," the Court fails to explain how this hypothesis could possibly be reconciled with the Plaintiff's own testimony that he was standing right up at the door of his cell and did not retreat at all during the alleged incident.

Finally, the Court attempts to explain away the Plaintiff's testimony that Defendant Gwinn continuously deployed the o/c spray for several minutes—testimony that the defense witnesses explained was physically impossible, since each cannister only contains twelve bursts (½ second to one second) of spray.  The Court surmises that "it would be wholly unremarkable for Plaintiff to have felt and considered that such a painful event lasted longer than it actually did."  Mem. Op. (ECF No. 79), at p. 29.  Yet, even setting aside the precise length of time, the Court does not explain how the Plaintiff could be subjected to repeated bursts of o/c spray for whatever period of time, yet remain quiet, not back away from his cell door, not wash himself off in his sink, not display any signs afterward that he had been exposed to o/c spray, not have his cell smell like o/c spray, and manage for the whole thing not to be noticed by the gun post officer or control booth officer.  And although the Plaintiff was provided with a list of all inmates in his

housing unit on the date in question, it is notable that he only chose to call one to testify—an inmate, by the way, that he had shared a housing history with for a significant period of time.

For these reasons, Defendant submits that this Court, based solely on the "dead body of the evidence, without its spirit," *Raddatz*, 447 U.S. at 679, has glossed over, discounted, and mischaracterized the testimony of the witnesses in order to conclude that "Defendant did in fact use OC spray against Plaintiff on April 5, 2016, and as a result, the lost Rapid Eye video would have been favorable to Plaintiff's case." Mem. Op. (ECF No. 79), at p. 30. The evidence does not lead inexorably to this conclusion. As the magistrate—the jurist best situated to consider the live testimony of the witnesses—found, the defense witnesses testified far more credibly and consistently than the Plaintiff.[18] Considering the record as a whole, the Plaintiff failed to carry his burden of proving that he was prejudiced by VDOC's failure to save a video that did not depict a use of force incident at all consistent with his version of events. If anyone is prejudiced by the lack of the video, it is the Defendant.

For these reasons, the magistrate correctly determined that the motion for spoliation sanctions should be denied, and this Court has erred in concluding otherwise.

**G.    The Court selected what is, in effect, an adverse inference sanction, but without also an express finding of intent to deprive, thereby violating F.R.C.P. 37(e).**

As a sanction, this Court elected not to "exclude[e] Fleming and Swiney's testimony altogether," but simply "giv[e] it less weight, on account of diminished credibility, regarding what they observed on the Rapid Eye video." Mem. Op. (ECF No. 79), at p. 30. It is not immediately clear, from this statement, precisely what sanction the Court is imposing,

---

[18] The Court also does not address the impact of its decision to accept some of the Plaintiff's testimony, but disregard other portions—such as his insistence that a handheld video camera was used to depict him coming out of his housing unit—and how the rejection of those portions of the Plaintiff's story might affect the internal consistency and credibility of the Plaintiff's remaining version of events.

particularly considering that the Court discounted that testimony in the first instance in order to come to this result.  But when considering that Sergeant Fleming and Mr. Swiney both testified that the video did not show a use of force incident at all, much less one consistent with the Plaintiff's version of events, the end result appears to be that the Court concludes that the video would not have supported the Defendant's version of events—in other words, that its contents were adverse to the Defendant and instead would have shown what the Plaintiff claimed it would have shown.  *See* Mem. Op. (ECF No. 79), at p. 30.  This is simply an adverse inference sanction by another name.  Yet, Rule 37(e)(2) expressly states that a Court may "presume that the lost information was unfavorable to the party" against whom sanctions are sought "only upon finding that the party acted with the intent to deprive another party of the information's use in litigation." Fed. R. Civ. P. 37(e)(2)(A).

Here, the Court has not found, or even implied, that Defendant Gwinn, or VDOC, or any other actor in play, failed to save the video "with the intent to deprive" the Plaintiff "of the information's use in litigation."  Sanctions under Rule 37(e)(2) are therefore not available.  And as cautioned by the Advisory Committee notes to the 2015 amendments to Rule 37, "[c]are must be taken . . . to ensure that curative measures under subdivision (e)(1) do not have the effect of measures that are [only] permitted under subdivision (e)(2)," Fed. R. Civ. P. 37, Advisory Committee Notes to 2015 Amendments.  Because the Court has effectively inferred that the missing video evidence would have been adverse to the Defendant, the party against whom sanctions are sought, the Court's sanction is too harsh.

* * *

Based on a thorough reading of this Court's opinion, it is evident that the Court feels frustration with VDOC based on the loss of the surveillance video from the date in question.

63

Defendant Gwinn shares that frustration. But sanctioning him for other individual's decisions serves no permissible or discernable purpose. The motion for sanctions was properly denied.

Because the motion for spoliation was a non-dispositive motion referred under § 636(b)(1)(A), this Court is bound to accept the magistrate's denial of that motion unless it was clearly erroneous or contrary to the law. It was not. For this reason alone, the Court should vacate that portion of its opinion dealing with spoliation sanctions and amend its judgment to reflect that the magistrate's discovery ruling should be upheld.

Moreover, this Court erred in determining that VDOC possessed a duty to preserve the surveillance video, that it knowingly breached, leading to spoliation of evidence. And even if there was some spoliation on the part of VDOC, the Court erred as a matter of law by imputing the misconduct of a separate agent/employee up to the principal/employer (VDOC), and then back down the chain of command to Defendant Gwinn. Although the law allows for a principal to be vicariously responsible for his agent's failure to save evidence, the same does not hold true in reverse. Also, because this Court made a spoliation finding for the express and stated purpose of punishing a state agency by exposing it to a monetary award of damages, the Court's reasoning violates the Eleventh Amendment.

Finally, even if there were some spoliation of evidence attributable to this Defendant, the Court erred by concluding that the Plaintiff carried his burden of showing that he was prejudiced by the missing evidence. And even if there was some prejudice, by selecting what is, in essence, an adverse inference sanction, this Court has violated the provisions of Rule 37(e).

## II. THIS COURT IMPROPERLY REJECTED THE MAGISTRATE'S CREDIBILITY FINDINGS.

As explained in detail above, *see supra* at pp. 24-27 & n.1, the overwhelming weight of authority holds that, if a district court judge questions the credibility findings of the magistrate

judge, made following an evidentiary hearing for a matter referred under § 636(B)(1)(b), the Court is not at liberty to simply discard them.  Doing so violates the due process rights of the litigants to a fair trial.

As a threshold matter, Defendant notes that this case, from the very beginning, was earmarked as involving credibility determinations that were going to need to be resolved by a factfinder.  The live testimony of the witnesses was critically important to those decisions.  This is not, then, a case that can be explained away as not involving a rejection of the magistrate's credibility decisions.  That is, rather, the only construction that can be placed on this Court's opinion.  *See, e.g.*, *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1249 (11th Cir. 2006) ("Quite simply, the two factual interpretations are impossible to reconcile in any practical sense—where one sees diligence and fair play, the other sees underhanded scheming and malevolence. The district judge's analysis necessarily and expressly rejected the magistrate judge's credibility findings.").

Turning, then, to the question of whether Due Process requires a district court to convene a new evidentiary hearing prior to rejecting the credibility findings of a magistrate, this requires consideration of the three factors set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). *See Raddatz*, 447 U.S. at 677; *see also Louis v. Blackburn*, 630 F.2d 1105, at 1109-10 (5th Cir. 1980). Those factors are, specifically:  (1) the private interests implicated; (2) the risk of an erroneous deprivation by reason of the process accorded and the probable value of added procedural safeguards; and (3) the public interest and administrative burdens, including costs that the additional procedures would provide.  *Louis*, 630 F.2d at 1109-10.

Here, the private interests implicated are the due process rights of the parties, including the right to a fair trial and the asserted constitutional rights of the Plaintiff.  Due process requires

that any given procedure afford adequate protection to the prisoner and the state, alike.  The Defendant has an interest in ensuring that he is not unfairly deprived of a property interest in the form of a monetary judgment against him, and that the deprivation only occur upon adequate notice and a proper hearing.  Defendant submits that having a factfinder summarily reject a party's testimony, after another jurist has expressly deemed it credible, does not constitute a "proper hearing."  Additionally, the Plaintiff in a suit under 42 U.S.C. § 1983 has an interest in seeking justice for an alleged constitutional violation.  The public, too, has an interest in ensuring fairness in the civil justice system, and the proposed additional procedure—a second evidentiary hearing—would involve some, but minimal, cost or administrative burden.  The first and third factors of the *Mathews* test, then, have been met.

The second factor, which has been described as "the crucial one that alters the delicate balance of due process," *id.* at 1110, tips the scale in favor of the rule advanced here.  Where a district court judge "agrees with the credibility determination of the magistrate," an additional hearing "would do little, if anything," to further protect the rights of the litigants.  *Id.*  "These safeguards are no longer present, however, when the district judge *rejects* the magistrate's credibility determinations."  *Id.*  (emphasis added).  "Another hearing would significantly increase the protection of the rights" of the parties, for "[i]f the district judge doubts the credibility determination of the magistrate, only by hearing the testimony himself does he have an adequate basis on which to base his decision."  *Id.*  "Upon hearing the testimony and observing the demeanor of the witnesses, he may come to the same conclusion as did the magistrate due to factors which are not disclosed on the face of a cold and impersonal written transcript."  *Id.*  "Or, indeed, he may feel that the magistrate did not correctly assess the credibility of the witnesses and reject his recommendation, as is his prerogative."  *Id.*

Considering the three *Mathews* factors, this Court should therefore join the overwhelming weight of authority and acknowledge that, when a district court judge questions the credibility findings of a magistrate, the Court cannot simply reject those findings, but should, instead, convene a new hearing so that he may observe that testimony for itself.  Failure to do so violates the Due Process Clause, which vests civil litigants with the constitutionally-protected right to a fair trial.  *See id.*; *see also Martin v. Duffer*, 686 F. Supp. 1523, 1564 (S.D. Fla. 1988) (where the court "made a determination of credibility upon the reading of a cold transcript," this "was a violation of [the litigant's] due process rights).

## III.   THIS COURT SHOULD ACCORD APPROPRIATE DEFERENCE TO THE MAGISTRATE'S CREDIBILITY FINDINGS AND ACCEPT THE MAGISTRATE'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW.

For the reasons expressed above,[19] the magistrate's credibility determinations were supported by the record evidence.  Although this Court is bound to review, *de novo*, a report and recommendation for a matter reviewed under § 636(b)(1)(B), other courts have opined that, as part of that *de novo* review, the district court should give deference to any credibility determinations made by the magistrate, as long as those decisions are supported in the record.  *See United States v. Michaels*, No. 5:19CR31, 2019 U.S. Dist. LEXIS 218832, at *8-9 (N.D. W. Va. Dec. 20, 2019) ("[C]redibility determinations based on live testimony are entitled to deference where they are supported by the record as a whole.").

Setting aside the Court's ruling on the spoliation motion and the corresponding sanction, and considering all of the testimony in the record, the magistrate's findings of facts, supported by his credibility determinations, accurately reflect the testimony presented at trial.   Several points bear noting here.  Defendant Gwinn, who had no history with this Plaintiff at all, would have no

---

[19] *See supra* at pp. 53-62.

motive to suddenly and inexplicably use o/c spray against him—as Defendant Gwinn testified, he has never used o/c spray during his career, at all, apart from training.  Under the Plaintiff's version of events, Defendant Gwinn would have had to physically stick his arm through a meal box, through the tray slot, all the way into the cell, and leave it there for some protracted period of time, during which he allegedly repeatedly sprayed the Plaintiff with o/c spray—all while the Plaintiff claims he just stood there and took it; did not retreat; and did not wash himself off in the sink afterwards.  That version of events defies logic.  The control booth officer, the gun post officer, and the other floor officer all testified that they did not detect any scent of o/c spray on this date—and if Defendant Gwinn had used the amount of spray the Plaintiff claimed, they certainly would have been able to smell it.  Yet, they did not see, hear, or smell anything that would have supported the Plaintiff's version of events.  They denied hearing the Plaintiff calling for help, ignoring his use of the intercom, or "joking" about his cries.  Sergeant Fleming expressly denied calling the Plaintiff a "baby rapist," as the Plaintiff testified—something that he certainly would have no incentive to do.  And none of the witnesses observed any signs that the Plaintiff had been exposed to o/c spray at all, much less for a protracted period of time—such as reddened eyes, coughing, or reddened skin—and the nurse who allowed him to take a shower after he complained did not document any such injuries, either.

Also under the Plaintiff's version of events, eight separate VDOC employees—two nurses, three corrections officers, two sergeants, and a unit manager with 17 years experience as a VDOC employee—seemingly conspired together to cover up the alleged use of the o/c spray, not document that it happened, and ignore the Plaintiff's request for medical attention—shouting that he said went on for 45 minutes.  As counsel argued at trial, "[T]o find for Mr. Johns, basically, the Court would have to find that all of these officers and staff members conspired

together; they came to court today to perjure themselves about what they say in that housing unit that day; that the control booth officers were basically blind, deaf, and lost their sense of smell on that particular day; that Officer Gwinn had a magical canister of OC spray that was capable of continuous operation for two to three minutes at a time; and that he was dumb enough to put his arm all the way into an offender's cell and leave it there for two to three minutes; and that Mr. Johns was content to sit back and bathe in the OC spray for those two to three minutes without doing anything, retreating or attempting to get away or grabbing the canister." (Tr. at 159-60). That, too, defies logic.

Because the magistrate judge properly weighed the testimony and reached credibility determinations that are amply supported by the trial record, Defendant Gwinn requests that this Court amend its findings of fact and conclusions of law, adopting the findings set forth by the magistrate, and enter final judgment in favor of the Defendant.

If, in the alternative, the Court retains serious doubts as to the credibility of the witnesses, Defendant requests that this Court vacate its opinion and order and convene a new evidentiary hearing, at which the Court may assess the live witness testimony for itself. This procedural mechanism will protect the due process rights of the litigants and prevent the critical credibility findings in this case from being based solely on a cold evidentiary record.

## IV.   OBJECTIONS TO SPECIFIC FINDINGS OF FACT

Finally, Defendant notes the following objections to specific findings of fact, which are either unsupported by the record evidence, or based upon credibility determinations contrary to those reached by the magistrate judge.

- Finding of Fact #10: Apart from the testimony of the Plaintiff and his witness, there was no evidence that Nurse Adams was present in the D-3 pod. Because

this finding conflicts with other record evidence—specifically, the fact that Nurse

Adams was evidently present in the infirmary making notes in the medical record

during this period of time—it should be struck.

- Finding of Fact #11:  Apart from the testimony of the Plaintiff and his witness,

  there was no evidence that Nurse Adams was present in the D-3 pod.  Defendant

  Gwinn asserts that the following finding is more accurate:  "At 7:10 a.m. on April

  5, 2016, two nurses entered the D-3 pod for morning pill pass.  Gwinn escorted

  them around the pod."

- Finding of Fact #12:  This finding is unsupported by the record evidence.  The

  testimony of the Plaintiff and his witness were in conflict, and the testimony of

  the Defendant and his witnesses was more credible.

- Finding of Fact #13:  Sergeant Fleming expressly testified that he was the

  individual who contacted the medical department, by phone, to request medical

  clearance in the event that o/c spray had to be used on the Plaintiff, and that he did

  so immediately following his first round through the housing unit, which,

  according to the control booth logbook, started at 6:52 a.m. Moreover, according

  to the control booth logbook, and as he testified, Sergeant Fleming was on the

  floor of the D3 housing unit between 8:05 a.m. and 8:20 a.m., when the Plaintiff

  was escorted out of the building.  Defendant therefore asserts that the following

  finding is more accurate: "At 7:25 a.m., Sergeant Fleming called the medical

  department and requested medical clearance to use OC spray or electronics on

  Johns.  Nurse Adams reviewed John's chart and noted no contraindications."

- <u>Findings of Fact #14, #15, #16, #17, #18, and #19</u>:   These findings are unsupported by the record evidence.  The testimony of the Plaintiff and his witness were in conflict, and the testimony of the Defendant and his witnesses was more credible.

- <u>Finding of Fact #21</u>:  As noted above, although Defendant Fleming did seek medical clearance only once, he testified that he did so immediately following his rounds, which, according to the logbook, occurred at 6:52 a.m.

- <u>Finding of Fact #24</u>:  This finding of fact contains conclusions and suppositions not supported by the record evidence.  Defendant asserts that the following finding is more accurate:  "At approximately 8:30 a.m., Johns complained to Nurse Mullins that he had been exposed to OC spray.  Nurse Mullins noted the complaint, told the officers escorting Johns to allow him to take a shower to decontaminate, and noted that he had no injuries."

Because these findings of fact are contrary to the record evidence, Defendant requests that they be stricken or amended, accordingly.

<strong>CONCLUSION</strong>

For the foregoing reasons, Defendant Gwinn respectfully requests that this Court vacate its opinion and order of November 30, 2020, amend its findings to uphold the magistrate's spoliation decision, which was not clearly erroneous or contrary to law, and—giving appropriate deference to the magistrate's credibility determinations—amend its findings of facts and conclusions of law to conform to the proposed findings of the magistrate judge.  In the alternative, Defendant Gwinn requests that this Court vacate its findings of fact and conclusions

of law and convene a new evidentiary hearing, following which this Court could make its own

determinations as to the credibility of the witnesses.

                                             Respectfully submitted,

                                             E. GWINN, Defendant.

By:     s/  Margaret Hoehl O'Shea
           Margaret Hoehl O'Shea, AAG, VSB #66611
           Attorney for named Defendant
           Criminal Justice & Public Safety Division
           Office of the Attorney General
           202 North 9th Street
           Richmond, Virginia 23219
           (804) 225-2206
           (804) 786-4239 (Fax)
           Email:  moshea@oag.state.va.us

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 23rd day of December, 2020, I electronically filed the

foregoing Memorandum in Support of Motion to Vacate, Alter, or Amend the Judgment using

the CM/ECF system, which will send a notification of such filing (NEF) to the following

CM/ECF participants: N/A, and I hereby certify that I have mailed by United States Postal

Service the document to the following non-CM/ECF participant:  Lameek S. Johns, #1169442,

Red Onion State Prison, P.O. Box 1900, Pound, VA 24279.

By:     <u>s/  Margaret Hoehl O'Shea</u>
Margaret Hoehl O'Shea, AAG, VSB #66611
Attorney for named Defendant
Criminal Justice & Public Safety Division
Office of the Attorney General
202 North 9th Street
Richmond, Virginia 23219
(804) 225-2206
(804) 786-4239 (Fax)
Email:  moshea@oag.state.va.us